McKESSON CORPORATION; Foremost Tehran, Inc.; Foremost Shir, Inc.; Foremost Iran Corporation; and Overseas Private Investment Corporation, Plaintiffs,

v.

THE ISLAMIC REPUBLIC OF IRAN; Financial Organization for the Expansion of Ownership of Productive Units; National Investment Company of Iran; Industries and Mines Bank; Foundation for the Oppressed; and Sherkat Sahami Labaniat Pasteurize Pak, Defendants.

No. CIV. A.82–00220(TAF).

United States District Court, District of Columbia.

May 26, 2000.

Opinion Denying Reconsideration Sept. 28, 2000.

**17**

*MEMORANDUM–OPINION*

FLANNERY, District Judge.

### I. Introduction

On June 23, 1997, this Court granted Plaintiffs' motion for summary judgment on the issue of liability, finding that Defendant Islamic Republic of Iran ("Iran"), acting through its co-defendants, had expropriated Plaintiff McKesson's 31% interest in an Iranian dairy company, the Sherkat Sahami Labaniat Pasteurize Pak ("Pak Dairy"), in April of 1982.[1] *See McKesson Corp. v. Islamic Republic of Iran,* Civ. A. 82–220, 1997 WL 361177 at *12 (D.D.C. June 23, 1997). This Court further held as a matter of law that Iran had wrongfully withheld from McKesson the payment of dividends declared by Pak Dairy in 1981 and 1982 (hereinafter the "1981 dividend" and "1982 dividend" respectively) and that Iran could be held liable in federal court for the expropriation and failure to pay dividends under the Treaty of Amity and customary international law. *Id.,* Mem. Op. at 24–31, 1997 WL 361177 at *12–*15; *see* Treaty of Amity, Economic Relations, and Consular Rights Between the United States of America and Iran, 8 U.S.T. 899 (1957). Between January 18 and February 17, 2000, a bench trial was held to determine the appropriate amount of damages. Iran was the only defendant appearing at trial.[2] In their case-in-chief, Plaintiffs first presented the testimony of Fred A. Loichinger ("Loichinger"), Chief Engineer of Pak Dairy from 1976 to 1978, and Robert C. Carpenter ("Carpenter"), a financial investment analyst and foreign investment manager for McKesson during the relevant period. Both testified regarding the condition of Pak Dairy up to 1978 and certain proposed expansions of its business. Plaintiffs also read into the record certain portions of the deposition of

Mark Rene Joelson, Washington, DC, Ralph N. Albright, Jr., Joseph P. Griffin, Mark Neil Bravin, Morgan, Lewis & Bockius, L.L.P., Washington, DC, for Plaintiffs.

Bruno Alexander Ristau, Andrews & Kurth, LLP, Washington, DC, Henry M. Lloyd, Boykin & Casano, P.C., Washington, DC, Thomas Gardiner Corcoran, Jr., Mary–Ellen Noone, Berliner, Corcoran & Rowe, L.L.P., Washington, DC, for Defendants.

Michaerl F. Hertz, Joan E. Hartman, U.S. Dept. of Justice, Washington, DC, for U.S.

1. "McKesson" collectively refers to all plaintiffs in this case other than the Overseas Private Investment Corporation.

2. As the remaining Defendants have never filed an answer or otherwise appeared, default has been entered against each by the Clerk, and accordingly, the trial for damages doubled as an *ex parte* determination of damages against the defaulting parties pursuant to Fed.R.Civ.P. 55(b)(2).

Alireza Dadyar ("Dadyar"), the then-Senior Accountant of Pak Dairy and in 1982 its Deputy Chief Accountant. As their fourth fact witness, Plaintiffs put on Leonard A. Patterson ("Patterson"), McKesson's Associate General Counsel, who testified chiefly regarding the value of McKesson's dividends for the years 1981 and 1982. Finally, Plaintiffs put on an appraisal expert, Robert Reilly ("Reilly"), to offer an expert opinion on the value of McKesson's equity interest in Pak Dairy at the time of the expropriation.

In Iran's case-in-chief, it put on Dadyar as a fact witness to testify to the condition of Pak Dairy in the early 1980s, Dr. Gholam H. Vafai ("Vafai") as an expert on Iranian law to authenticate certain Iranian legal documents and Anatole Richman ("Richman") as an appraisal expert offering a contrary view of the value of McKesson's interest in Pak Dairy in April of 1982.

In Plaintiffs' rebuttal case, Reilly gave further testimony. Plaintiffs also put on Professor Shaul Bakhash ("Bakhash") as an expert on Iranian history to testify to the absence of bombing in Tehran in 1981 and 1982.

On March 16, 2000, the parties made their closing arguments. Now, upon reviewing the testimony and exhibits in evidence, as well as the relevant law, the Court enters the following findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a). In making its findings and conclusions, the Court bears in mind that the burden of proving the amount of damages is upon the Plaintiffs. *See Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C.Cir.1997); *Gould v. U.S.*, 160 F.3d 1194, 1197 (8th Cir.1998); *Aeronca, Inc. v. Style–Crafters, Inc.*, 546 F.2d 1094, 1096 (4th Cir.1976).

## II. Findings of Fact

### A. The Plaintiffs

The Plaintiffs include four United States corporations which hold formal title to the expropriated shares in Pak Dairy: McKesson HBOC, Inc. and three wholly owned subsidiaries, Foremost Tehran, Inc., Foremost Shir, Inc. and Foremost Iran Corp. When this litigation commenced, McKesson HBOC, Inc. was named Foremost McKesson, Inc. It changed its name to McKesson Corporation on July 27, 1983 following the sale of all of its dairy interests around the world. In January of 1999, it adopted its current name. McKesson's total equity interest in Pak Dairy is 31%, with 10% held by each of the three subsidiaries and 1% held by McKesson HBOC, Inc.

The remaining co-plaintiff is the Overseas Private Investment Corporation ("OPIC"), an agency of the United States which insures private overseas investments of United States nationals. *See* 22 U.S.C. § 2191. OPIC had insured McKesson's interests in Pak Dairy and seeks to recover monies paid in settlement of McKesson's insurance claim.

### B. Iran

Throughout the 1960s and for most of the 1970s, Iran was governed by Mohammad Reza Pahlavi ("the Shah"). However, political turmoil began in the last half of 1978 with labor strikes and general unrest and culminated later that year in the Iranian Revolution ("Revolution"). In December of 1978, the Shah left the country and in February of 1979, a new government was formed based on the rule of Islamic law and following a far more socialist approach to regulating the economy than the previous regime had taken. Most dramatically, the new government nationalized a number of industries such as oil, gas, railways, fisheries, metal, shipping, aircraft and automobiles. While it did not nationalize the dairy industry, it maintained strict price controls over dairy products and also controlled the distribution of raw dairy materials including milk and butter. For example, all foreign imports of raw butter were obtained directly by the government, which then redistributed allotments of butter to the various dairy companies. In addition, Iran set up new labor laws, which *inter alia* established Worker's Islamic Councils. A Council for a

particular company was elected by the company's employees and had an ambiguous role to play in influencing corporate policies and decisions regarding working conditions and pay. All of these new laws and policies were in place by the middle of 1979, and continued to apply through April of 1982.

In November of 1979, Americans at the United States Embassy in Tehran were taken hostage and shortly thereafter, Iran was subjected to an international trading embargo. However, after the release of the hostages in January of 1981, most nations lifted the economic embargo, the notable exception being the United States. All the economic data in 1981–82 indicates a relatively quick return to normalization of international trade. In particular, Japan, West Germany and Holland engaged in substantial trade with Iran. However, Iran's international trade overall was still lower in 1982 than it had been prior to the Revolution.

On September 22, 1980, Iraq commenced a war against Iran (the "Iran–Iraq war") by a surprise attack on Iran's southwestern border. Initially, Iraq was successful, seizing Iranian territory along the border that included several important oil fields. During 1981, the war was largely or solely fought in Iranian territory. However, around the start of 1982, the tide turned and Iraqi ground forces were driven from much of the territory they had occupied, including the oil fields. Iraqi retreat from Iran was substantially complete by April of 1982.

On the first day of the war, Iraq bombed several military bases and airfields in Iran, including the Tehran Marahab Airport which was situated on property adjacent to Pak Dairy. In October, Iraq bombed several oil refineries. The bombing campaign proved, however, to be a failure overall. Several bombs did not go off; others missed their targets. The Tehran Airport specifically suffered slight damage to its runway, which was repaired quickly.

 After these early attacks, bombing in Iran was minimal. There was no bombing of Tehran at all in 1981 or 1982. However, sorties and bombing runs were made on cities a few hundred miles to the southwest (i.e. near the border between Iran and Iraq where the ground fighting was taking place). Further, Iraqi jets were occasionally seen making flights over Tehran.[3]

3. The Court bases its conclusions in part on the testimony of Plaintiffs' expert on Iranian history, Shaul Bakhash ("Bakhash") and Iran's submission of Iranian newspaper articles in response. At trial, Defendant objected to the testimony of Bakhash on the grounds that he had not previously been disclosed as an expert witness which Plaintiffs would call. Plaintiffs argued that his testimony was offered only to rebut the testimony of Dadyar which suggested that bombings occurred in Tehran in 1981 and 1982. The Court allowed the testimony of Bakhash provisionally, subject to a later determination as to its propriety after a briefing by the parties. It also allowed Defendant to supplement the record with relevant Iranian newspaper articles.

The Court now finds that Bakhash's testimony regarding bombing should be admitted. Defendant argued that Bakhash could not testify to historical events because he had not witnessed them personally. However, a historical expert may testify regarding historical facts within his field of expertise. See, e.g., Denson v. Stack, 997 F.2d 1356, 1363 (11th Cir.1993) (Clark, J., dissenting); Laipenieks v. I.N.S., 750 F.2d 1427, 1428 (9th Cir.1985); Houston v. Lafayette County, 20 F.Supp.2d 996, 1003 n. 5 (N.D.Miss.1998); U.S. v. Ciurinskas, 976 F.Supp. 1167, 1170 (N.D.Ind. 1997), aff'd, 148 F.3d 729 (7th Cir.1998). Here, Plaintiffs established Bakhash as an expert in modern Iranian history. Indeed, one of the books which Bakhash has authored, The Reign of the Ayatollahs, was relied upon by Defendant's expert in developing his valuation. Accordingly, Defendant's argument is rejected.

Defendant also claims that Plaintiffs did not timely disclose Bakhash as a testifying expert or his expected testimony in compliance with Fed.R.Civ.P. 26(a)(2), which requires disclosure of expert testimony within the time set by the Court. However, late disclosure of an expert may be excused where there is a showing of "substantial justification" for the lateness. Here, plaintiffs have made such a showing. First, the need for the testimony on bombing and missile attacks only became apparent after Dadyar's testimony at trial as Dadyar had not made allegations regarding bombing in Tehran previously and Defen-

**20**

Inflation was a serious problem for Iran both before and after the Revolution, running about 20% between 1977 and 1982. In the dairy industry specifically, inflation rates were 14% in 1978, 15% in 1979, 18% in 1980 and 24% in 1981.[4] High inflation prior to the Revolution was a result primarily of excessive growth in certain sectors of the economy and an imbalance between supply and demand. After the Revolution, it continued in part due to the embargo and the Iran–Iraq war.

## C. Pak Dairy

In 1959, a group of private Iranian citizens asked McKesson, a Maryland corporation (then operating under the name Foremost–McKesson, Inc.), to join them in establishing a dairy business in Tehran, Iran. McKesson agreed to provide half of the required capital, all management and personnel, procurement services, ingredients and packaging. A joint venture agreement was executed and, through a separate agreement, McKesson agreed to provide technical assistance, licensed its trademark and provided procurement and engineering capability.

Pak Dairy was incorporated and formally registered as an Iranian private joint stock company on March 12, 1960. From 1960 until 1979, McKesson provided the company's top management. Until October 1981, McKesson representatives sat on the Board of Directors of Pak Dairy. Although McKesson initially owned a 50% interest in the company, by 1978 it had reduced that interest to 31 percent.

Frank Fisher ("Fisher") was the managing director of Pak Dairy from shortly after its founding until November of 1979, when he left Iran to return permanently to the United States. As managing director, Fisher had performed duties equivalent to a chief executive officer of a corporation. In October of 1980, Mohamad Khabiri ("Khabiri") was elected Managing Director by the Board and held the position through the date of expropriation.

Pak Dairy's operations occurred at two plants located in Tehran: a main dairy plant at Old Karaj Road on land immediately adjacent to the Tehran Airport, and an ice cream production plant known as Canada Frost approximately a quarter mile away. Principle products at the main facility included fluid milk in white, chocolate and strawberry flavors, a heavy breakfast cream, butter, yogurt and cottage cheese. At the ice cream facility, Pak Dairy made a variety of ice cream products in various flavors.

dant's expert Richman had testified in deposition that he did not rely on allegations of bombing in making his valuation. Second, the Bakhash testimony was proper rebuttal, directly addressing and impeaching the Dadyar's testimony by asserting that no bombings had occurred in Tehran in 1981 or 1982. Third, Plaintiffs' lack of access to persons who witnessed events in Tehran during 1981 and their resulting reliance on historical expert testimony is in part a result of Iran's refusal, in direct violation to two of this Court's orders, to allow Reilly into Iran to examine Pak Dairy and interview its personnel. Iran asserted a sovereign interest in controlling who crossed its borders, but allowed its own American valuation expert to enter Iran and have access to Pak Dairy's facilities and personnel. The prejudice to Plaintiffs as a result of this discriminatory restriction further supports the fairness of allowing the Bakhash testimony on a limited factual issue raised by the Defendant for the

first time in its case in chief. Finally, to enable Iran to respond to the testimony, the Court provided Iran, at its request, time to gather and submit evidence of Iranian newspaper articles relating to bombing attacks in Tehran. The Court finds that Defendant was adequately able to respond to Bakhash and support its own position through this measure. Accordingly, both the testimony of Bakhash on bombings and the newspaper articles translated by Dr. Vafai and submitted by Iran will be allowed into evidence.

4. These are the rates for Iranian years 1357–1360. The Iranian calendar year begins in March of the Gregorian calendar. Thus, Iranian year 1357 extended from March 22, 1978 to March 21, 1979. The Court will follow the convention of referring to Iranian years using the Gregorian year in which it starts. Thus, Iranian year 1357 is equated to Gregorian year 1978, 1358 to 1979, 1359 to 1980, 1360 to 1981.

Pak Dairy did not produce its own raw milk or raw butter. The company obtained 17% of its daily supply of fresh milk from a dairy herd company called Sepahan, in which Pak Dairy had approximately a 20% ownership interest. The remainder came from contracts with government-run dairies. Pak Dairy purchased butter in frozen blocks on the international market. Because storage room at the plant was insufficient to contain all of its frozen butter, Pak Dairy stored most of its supply in cold storage warehouses downtown and would bring a block to the main dairy plant as needed for processing and repackaging into butter packs wrapped in foil. As with butter, the foil and other packaging materials were also purchased on the international market.

Between the two plants, Pak Dairy was capable by 1978 of producing 175 tons of milk, 60 tons of butter and 60 tons of ice cream per day. By the end of 1966, Pak Dairy's operations were profitable and remained so every year thereafter through 1982.

## D. Procedural History

McKesson commenced the instant action on January 22, 1982 alleging that Iran, acting through its agents, had *inter alia* illegally withheld dividends issued by Pak Dairy in 1979 and 1980 and that as a result of this and other interferences with its property rights, McKesson's equity interest had been effectively expropriated as of May 27, 1980. Pursuant to Executive Order No. 12294, 46 Fed.Reg. 14111 (1981), this Court stayed the action pending an adjudication of McKesson's claims by the Iran–U.S. Claims Tribunal ("the Tribunal") in The Hague.

On April 10, 1986, the Tribunal issued a ruling. *See Foremost–Tehran, Inc. v. Government of the Islamic Republic of Iran,* Award No. 220–37/231–1 (*filed* April 11, 1986), *reprinted at* 10 Iran–U.S. Cl.

Trib. Rep. 229 (1987). It found that the 1979 and 1980 dividends had been illegally withheld from McKesson and that Iran was responsible for the nonpayment. *Id.* at 252. It therefore ordered Iran to pay McKesson an amount equal to the dollar value of the two dividends plus interest. *Id.*

However, the Tribunal also found that Iran's "creeping" interference with McKesson's property rights did not, by January 19, 1981, ripen into the sort of "irreversible deprivation" of property which amounts to a de facto expropriation. *Id.* at 249–50. Because a claim must have been "outstanding" on January 19, 1981 to fall within the Tribunal's jurisdiction, *see Foremost–McKesson, Inc. v. Iran,* 905 F.2d 438, 441 (D.C.Cir.1990); *Foremost Tehran, Inc.,* 10 Iran–U.S. Cl. Trib. Rep. at 233 n. 5, the Tribunal did not consider whether the property was expropriated subsequent to that date.

Plaintiffs then revived this action on April 1, 1988 by filing a motion for partial summary judgment on liability, alleging that Iran's conduct subsequent to January 19, 1981 when viewed in addition to Iran's earlier conduct did constitute a legal expropriation after the Tribunal's jurisdictional cut-off date.[5] The Court subsequently found as a matter of law that Iran had illegally withheld from McKesson its share of the dividends issued in April of 1981 and 1982, and that by April 1982, Iran's interference with McKesson's property rights amounted to an expropriation.

## E. Summary of the opposing valuations of McKesson's equity interest in Pak Dairy

Both Plaintiffs and Iran put on a valuation expert who testified as to the fair market value of McKesson's 31% interest in Pak Dairy at the time of the taking. The experts defined "fair market value"

---

5. In accordance with Executive Order 12294, "those claims not within the jurisdiction of the Claims Tribunal will 'revive' and become judicially enforceable in United States courts." *See Dames & Moore v. Regan,* 453 U.S. 654, 684–85, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981).

somewhat differently, however. Iran's expert, Richman, viewed the relevant fair market value as that price which would be paid for the 31% interest by a willing buyer to a willing seller. Plaintiffs' expert, Reilly, testified that he calculated the value as the price between a willing buyer and a less-than-willing seller. For all aspects of their calculations save one, the application of a lack of marketability discount (see below), this distinction did not make a difference in the methods by which each calculated value.

Plaintiffs' valuation expert, Reilly, used two methods of valuation: (1) the discounted cash flow ("DCF") method and (2) the direct capitalization ("DCAP") method. Both methods measured the value of Pak Dairy as a going concern by converting a projection of future income into an equivalent April 1982 present value. However, the DCAP method projects income only one year into the future based on a historical annual income average and assumes that the company will have steady growth rate in perpetuity. The DCF method forecasts income a number of years into the future based on factors or assumptions that may not reflect historical patterns and does not assume that each future year will have the same amount of growth.

For each method, Reilly made two calculations of value. In one calculation, he adjusted the value of the company upward to account for the potential income of certain Pak Dairy projects (hereinafter the "New Projects") which had been planned but not yet fully implemented by the valuation date. In the second calculation, Reilly determined the value of the company ignoring any potential income from the New Projects. Using the DCF method, he calculated the value of Pak Dairy with the New Projects to be $88.4 million. Using the DCAP method, he calculated the value of Pak Dairy with the New Projects to be $68.4 million. Because he found these two methods equally reliable, he concluded that the value of the entire company with the New Projects was the average of these two figures, $78.4 million, and that the

value of McKesson's 31% interest was $24.3 million.

He then calculated the value of Pak Dairy without the New Projects using both methods. Using the DCF method, he calculated the value to be $56.2 million. Using the DCAP method, he calculated the value to be $55.7 million. Again averaging the two values, he concluded that the value of Pak Dairy without the New Projects was $55.95 million, and that McKesson's 31% interest was equal to $17.4 million.

Richman rejected the DCF method as overly speculative, and applied only the DCAP method. He found that no adjustment should be made for the potential income of the New Projects. Using the DCAP method, he determined the value of Pak Dairy to be $7,302,835. He then applied a 10% lack of marketability discount, and took a further discount of 35% for McKesson's minority status. His final valuation of McKesson's 31% interest was approximately $1.3 million. In contrast, Reilly took no lack of marketability discount, testifying that one was not appropriate in a forced-sale situation. He also took no minority discount, testifying that his valuation was already performed on a minority basis.

Both Plaintiffs and Iran introduced evidence in support of their respective valuations which was only available after the valuation date. However, under the "known or knowable" rule, a retrospective appraisal (where the effective date of the appraisal is prior to the date of the appraisal report) should be based on information which would have been known or knowable by an investor at that time. The sole appropriate use of information available only after the valuation date would be to establish by inference the existence of a fact that would be known to an investor prior to that date. Accordingly, in connection with the valuation of Pak Dairy, the Court considers only the facts that would be known or knowable by April of 1982.

Overall, the Court finds that of the two experts, Reilly was more qualified and experienced. Although both experts had

spent years engaging in valuations of small companies, Reilly had a superior background in valuing corporations in foreign countries in general and Iran in particular. Richman stated that he had never performed a valuation analysis on a foreign corporation, let alone one in Iran. Reilly by comparison has valued numerous international business, and in particular had valued six to eight companies in Iran that had been expropriated, testifying six times before the Tribunal in support of his opinions. Richman's general knowledge of Iran stemmed from a relatively brief list of sources, compared with the "banker's boxes" of Iranian data with which Reilly was familiar. Nevertheless, the Court finds that Richman was a competent appraiser whose opinions deserve to be weighed carefully against Reilly's in light of all the evidence.[6]

## F. Direct Capitalization Method

The DCAP method is one of the income-based methods of valuation, which are used to value a company as a going concern by converting a projection of the company's future profits into an equivalent equity value. Both experts relied on this method to value Pak Dairy. Under the DCAP method, the valuator first calculates the historical average annual cash flow over a period of years approximating one business cycle and then, based on that average and the company's long term growth rate, projects income one year into the future. This projected or "normalized" income is what will be converted into equity value or "capitalized." The projected income is obtained by multiplying the average historical net cash flow by $(1 + G)$ where G is the estimated long term growth rate of the company. The value of the company is then equal to the projected income divided by the "capitalization rate." The capitalization rate in turn is equal to the "present value discount rate" minus the long term growth rate. In sum, the overall DCAP formula is as follows:

---

**6.** Although Richman's essential competency was evident at trial, his credibility was somewhat undermined. His representations regarding his qualifications as an appraisal expert were shown under cross-examination to be inaccurate in two respects. In addition, Richman conceded that in performing his valuation, he had violated the ethics rules established in the Uniform Standards of Professional Appraisal Practice ("USPAP"). USPAP is promulgated by the Appraisal Foundation, a quasi-government agency created by Congress to regulate appraisers in the United States. Certain appraisal organizations require their members to follow these rules, and compliance with USPAP is necessary when the appraisal is being performed for a federal agency. Although Richman was not a member of any organization requiring compliance with USPAP and thus was not bound in this case to follow its rules, the Court finds USPAP persuasive evidence of appropriate appraisal ethics and practices. USPAP ethics rules prohibit an appraiser from accepting an assignment which includes the reporting of predetermined opinions. In this case, Richman was asked by Iran to do a preliminary appraisal of Plaintiffs' interest prior to being retained, and he came back with an assessment that the interest "may have been valueless" as of April 1982. Tr. 2/15/00 p.m. at 71.

After being retained, Richman continued to pursue this value, asserting in a written request to Iran for relevant data that "it is most important for my investigation and report to show that there was no market, no investors, and no sales of Pak Dairy during the years 1980 through 1985." Tr. 2/15/00 p.m. at 73. This approach is not consistent with USPAP's ethics rule and suggests an inappropriate bias in Richman's appraisal methods.

A further concern is that Richman conceded that he had destroyed his preliminary notes because "[h]e knew there was going to be a subpoena coming." Tr. 2/15/00 p.m. at 78, 80. While it is not clear that this violates USPAP, which only requires maintenance of documents which are "necessary" to the valuation opinion, Richman's desire to conceal the contents of these material documents from the Plaintiffs implies that there was information in them which would be contrary to his stated opinions.

Although these problems undermine Richman's credibility, the Court does not consider them sufficient to reject his opinions out of hand. Rather, as stated previously, his opinions were carefully considered in light of the reasons and evidence offered to support them and weighed against the reasonableness of Reilly's contrary views.

$$Value = \frac{C\,(1+G)}{D-G}$$

Where C = Historical Average Annual Net Cash Flow
G = Long Term Growth Rate
D = Present Value Discount Rate

The key factors to be determined are thus the long term growth rate, the average historical net cash flow, and the present value discount rate.

### 1. Long Term Growth Rate

■ The long term growth rate is that rate of growth expected to continue in perpetuity. Reilly estimated the long term growth rate to be twenty (20) percent. In highly significant contrast, Richman estimated the growth rate to be zero (0) percent.

In arriving at a growth rate of 20%, Reilly estimated the long term growth in real value at 15% and, because he calculated his other values with inflation built in, added 5% to account for expected growth in prices due to inflation. The Court finds that the 5% inflationary component of growth is appropriate but that the prediction of 15% long term real growth is excessive.

Reilly based his prediction of real growth primarily on two factors: first, a 1978 report, prepared by Carpenter based on projections provided by Pak Dairy's management, forecasting 15% growth in sales of Pak Dairy's existing products each year from 1978 through 1982; second, a substantial increase in population subsequent to the 1978 projection.

The 1978 report prepared by Carpenter in turn made its projections based on a number of factors. First, in the preceding relatively low-inflation years, Pak Dairy had experienced steady and very significant growth in product sales, from approx-

imately $13 million in 1973 to $31 million in 1976. Further, trends within the dairy market in Iran indicated that this growth would continue. The report also predicted continuing economic growth in Iran's economy overall based in part on a combination of political stability, favorable government attitude towards private enterprise, a favorable environment for foreign investment and an expectation of government growth-oriented expenditures in its next five-year economic plan (the Sixth plan adopted by the Shah).

All of these assumptions soon turned out to be incorrect, as the Iranian Revolution took place shortly after Carpenter issued his report, leading to an Islamic regime with strong socialist characteristics and a hostility to Western culture, management style and investment. The Sixth Plan was of course never adopted, and the Iran–Iraq war, another unforeseen development, added to the economic disruption and the drain on Iran's resources. However, although the impact of these unforeseen events was dramatic in 1980, the effect had significantly although not entirely diminished by April of 1982.

For example, contrary to Carpenter's prediction, total gross domestic product for Iran dropped considerably between 1979 and 1981. However, this loss was almost entirely due to the drop in oil revenues that resulted from Iraq's seizure of Iran's south-western oil fields early in the Iran–Iraq war. By April of 1982, Iraq had been largely pushed out of Iran and Iran's oil fields had been reclaimed. The effect of

Iran's battle victories was noted in a March 1982 report by the Tehran Stock Exchange:

> The beginning of the year 1982 coincided with the brilliant victory of the Iranian army in the war fronts against the aggressor, Iraq, which, in itself, paved the way for reconstruction and revival of the country's economy. The increase of the public confidence in the banking system, the considerable growth of the private sector's savings with the banking system and *rapid increase of oil export during this year,* were amongst the significant consequences of these victories.

Pl.Ex. 51 at IR670 (emphasis added). This turnaround, coming after the end of the international trade embargo in early 1981 and the return of substantial amounts of foreign trade thereafter supports the conclusion that, as of 1982, real growth in Iran's economy could be reasonably expected notwithstanding the new socialist regime and the ongoing war. Indeed, the agricultural sector, which is the sector in which Pak Dairy operated, not only grew every year between 1977 through 1981 notwithstanding the war and the new regime but had its highest rate of growth in 1981. Further, in that year, new investment in most forms of business rose from $18,152,000 in 1980–81 [7] to $29,728,000 in 1981–82, a real increase in investment of roughly 30 percent. Thus, as of April of 1982, real growth could reasonably be expected in the economy overall and the agricultural sector in particular.

As with Iran as a whole, Pak Dairy faced difficulties which Carpenter had not foreseen. The war with Iraq, while not inflicting any direct damage on Pak Dairy's operations, nevertheless impacted on it in several ways. In 1981, Pak Dairy had made a substantial financial contribution to the war effort. It also contributed food, refrigerated trucks (used in the war for the purposes of transporting the dead), payments to the relatives of martyrs and payments to employees serving in the military for the difference between their military salary and their civilian salary. In addition, the war caused labor shortages, resulting in a decrease in Pak Dairy's workers from 743 in December of 1980 to 707 by the end of 1981. Given that the war was ongoing in April of 1982, it is reasonable to expect that Pak Dairy would continue to provide some form of resource for the war-effort and be limited in its ability to obtain new labor. However, as the trend in the war in April of 1982 was dramatically in Iran's favor, a reasonable investor would expect such collateral expenses from the war to decrease in the future.

Pak Dairy's problems also included shortages of raw materials such as liquid milk, butter and spare parts and an underutilization of capacity due to these shortages. Supply of raw milk was a critical problem for Pak Dairy, as the amount declined in 1981 from around 120 tons per day to only 75 tons per day, less than half the company's production capacity. This reduction followed a threat in 1980 from the Iran Milk Industries Company ("IMIC"), an Iranian instrumentality responsible for the payment of government milk subsidies. IMIC warned Pak Dairy to reduce its milk purchases to no more than 100 tons or else forfeit milk subsidies for any milk over that amount. IMIC indicated that the reduction was necessary because of a general shortage and the need to equitably distribute the available supply. However, in light of the fact that total milk production in Iran rose in both 1980 and 1981, and considering the Board's confidence in early 1982 that they would receive a "fair" distribution of this supply by the beginning of 1983, it is reasonable to expect that Pak Dairy's allotted supply of milk would grow. The Managing Director actually predicted in February of 1982 that the company would later in the year be able to obtain raw materials neces-

---

**7.** This corresponds to the Iranian year 1360, which extended from March 1980 to March 1981.

sary to maximize production, and Dadyar testified that milk supply in 1982 had already risen to 80 tons per day, a 7% increase over 1981. In addition to the increasing milk supply, shortages in other areas were also being addressed. The Board of Directors noted on April 4, 1982 that it had succeeded in obtaining 25 million rials worth of spare parts for its production machines. The Court finds that as of the valuation date, a reasonable investor would conclude that Pak Dairy's supply shortage problems would continue to improve after the valuation date.

Price controls imposed by the government represented another hindrance to new growth, as they constrained Pak Dairy's ability to respond to rising costs. Carpenter noted that such controls operating before the Revolution "had seriously reduced business profits and created a significant uncertainty in business circles." Pl.Ex. 4 at MC 8623. He predicted that the new government put in place by the Shah in 1976 would begin modifying the price control policy to allow reasonable price increases and generally speaking take a more favorable approach to business. This prediction proved unreliable after the Shah's "new government" was removed and replaced by an Islamic regime which maintained strict price controls during the high-inflation years after the Revolution. Although Pak Dairy had success in those days in obtaining permission to increase prices as needed, it is likely that the effects which Carpenter noted in 1978, which he assumed would diminish under a more business-favorable regime, would at least continue under the socialist post-Revolution regime. However, the price control system existed before the Revolution, yet from 1973 to 1977, Pak Dairy's sales grew at a compound growth rate of 22.1% a year.

The overall impact of these problems can best been judged by Pak Dairy's actual revenue results in 1980 and 1981. Although in 1980, Pak Dairy's revenues dropped more than 65% from the previous year before adjusting for inflation, the company returned in 1981 to its historic pattern of real growth. Overall, its net profit before taxes increased from 134 million rials in 1980 to 178 million rials, roughly 33% or approximately 9% after adjusting for inflation in the dairy market. This improvement could reasonably be expected to continue in 1982 because of the improvements in both the Iranian economy and the dairy industry and because of reasonably expected increases in supplies.

The population statistics relied upon by Mr. Reilly add further support to the conclusion that Pak Dairy would continue to experience real growth after April 1982. In Iran overall, population significantly expanded every year between 1976 and 1982, from 33.7 million in 1977 to 40.8 million in 1982, a 21% overall increase. The rate of increase was even higher in Tehran because the Iranian Revolution precipitated an acceleration of migration from rural to urban areas. Between 1978 and 1980, the population of downtown Tehran alone (ignoring the suburbs of Tehran) increased from 4 million to 6 million, a fifty percent increase in population in three years or less. That was particularly significant for Pak Dairy because Tehran was its principle market and Pak Dairy controlled about a third of the milk market in that city. There is a strong correlation generally between population and the consumption of dairy products. The correlation would be particular strong here for two reasons. First, the population increase was disproportionately made up of younger persons, ranging from zero to ten years, when persons are drinking more milk than at later years. Second, the Middle-eastern diet involved consumption of dairy products to a greater degree than the American diet.

Although this correlation had not appeared by 1982 due to other factors such as limitation of supply, it supports the conclusion that as supply and the overall economy improved, growth would closely follow. It also provides an additional reason to believe that the Iranian government would take steps to improve milk supply, given the increased demand and the Irani-

an government's concern on ensuring that the basic needs of its people would be met. The government's expressed position that increasing the production of dairy products was one of its "top priorities" was noted by the Board in early 1982.

Viewing the existing external difficulties of Pak Dairy, many stemming from either the socialist character of the Iranian government and the ongoing war with Iraq, as well as the specific difficulties of Pak Dairy and taking into account the positive developments both in Iran and the company specifically, the Court finds that the record supports a long term real growth forecast of 10% and that the overall long term growth rate, including a component for inflation, is therefore 15 percent.

## 2. Net Cash Flow

In calculating average net cash flow, a valuator looks to the actual historical annual profits of the company. However, the valuator must also be satisfied that the historical cash flow is representative of future cash flow and if it is not representative, adjustments to the historical numbers must be made. For example, where historical net income is reduced by unexpected and non-recurring expenses, adding back those expenses to income is appropriate in calculating an accurate and representative average net cash flow.

As an appropriate historical period approximating one business cycle, both experts in this case looked at Pak Dairy's net cash flow during the five-year period 1977–1981. To determine cash flow for each of these years, both experts looked to the company's audited financial statements. However, they disagreed regarding three aspects of the calculation. First, they disagreed slightly on the foreign exchange rate to apply to the figures in the financial statements. Second, they differed in whether to calculate net cash flow on a pre-tax or after-tax basis. Reilly calculated the average net cash flow on a pre-tax basis, whereas Richman calculated the after-tax average. Finally, in Reilly's calculation, he found that adjustments to the historical cash flow were appropriate, be-

cause of non-recurring expenses and because the historical income did not reflect the profit-earning potential of the New Projects. Richman found that no adjustments should be made.

### a. Official Exchange Rates

■ The figures in the audited financial statements were in rials, the Iranian currency. In calculating their historical average net cash flow, both experts converted the figures in the financial statements to U.S. dollars at the official exchange rate. However, they determined that rate using different sources. Richman used the official exchange rates as published by Bank Markazi, the Central Bank of Iran while Reilly converted the figures to U.S. dollars using the rial-to-dollar exchange rates published by the World Bank.

The World Bank's publication of exchange rates for Iranian rials is based on a calculation of the average exchange rate used by Iran in its actual transactions with foreign entities using the International Monetary Fund ("IMF") as a clearinghouse. Because the World Bank published rate is the actual exchange rate that Iran used when it conducted business through the IMF, the Court accepts it as appropriate and sufficient evidence of the Iranian official exchange rate. As published by the World Bank, the average official exchange rate was 70.58 rials to the dollar ("rtd") in 1977; 70.48 rtd in 1978; 71.5 rtd in 1979; 71.57 rtd in 1980; 80.03 rtd in 1981; and 84.45 rtd in 1982.

### b. Calculation Pre–Tax or After–Tax

Reilly testified that calculation of net cash flow could be made either on a pretax or after-tax basis, so long as all the factors in the DCAP formula were calculated on a consistent (pre-tax or after-tax) basis. Thus, he testified, if a pre-tax normalized income (the numerator in the DCAP formula) is divided by a pre-tax capitalization rate (the denominator), the resulting value is the same as it would be if both numerator and denominator were

calculated on an after-tax basis. Reilly testified that he did in fact calculate the factors in both numerator and denominator on a consistent pre-tax basis.

Richman testified that he calculated net cash flow on an after-tax basis in part because it was required by the data source on which he relied to calculate his present value discount rate. Richman read an excerpt from this source, the 1999 Ibbotson Report, which suggests that its equity data (whose specific role in the present value discount rate is discussed in greater detail below) are calculated on an after-tax basis and should only be used on after-tax cash flows. However, although Reilly also relied in his valuation on data from an Ibbotson study, the specific study was Ibbotson's 1981 Yearbook, not the 1999 Report. Further, in requiring after-tax cash flow for an after-tax rate of return data, Ibbotson implicitly acknowledged the alternative of using a pre-tax cash flow for a pre-tax premium. The Court finds that Reilly appropriately calculated net cash flow on a pre-tax basis.[8]

### c. Adjustments

■ Without making any adjustment for the New Projects, Reilly determined that the average net pre-tax cash flow between 1977 and 1981 was $2,967,000. In calculating this average, Reilly adjusted the 1981 net income figure by adding back a single non-recurring expense, a $500,000 voluntary contribution to the war effort. The Court finds that the contribution was appropriately treated as a non-recurring expense and therefore accepts $2,967,000 as the average annual net pre-tax cash flow without taking the potential income of the New Projects into account.

■■ Reilly testified that the income figures for years 1979 through 1981 should also be adjusted to reflect the earning potential of three New Projects. Specifically, he added $320,000 to the net income for 1979, $1,116,000 to 1980 and $1,734,000 to 1981. Taken together, these further adjustments due to the New Projects increased Reilly's calculated average historical net income by $634,000.

These adjustments were based on projections of income from the New Projects made by Carpenter in 1978. Carpenter had joined McKesson in 1964 as a financial analyst and in this capacity, he worked with approximately 25 overseas companies in which McKesson had an equity interest and routinely reviewed their financial statements and audit reports. Beginning in 1973 or 1974, Carpenter was the planning manager for McKesson's overseas investments, which required him to analyze new opportunities to invest in business overseas and to increase the profitability of then existing operations. While employed by McKesson, Carpenter visited Pak Dairy between 15 and 20 times, with his first visit in 1970 and the last in 1978. Each time he was in Iran, Carpenter attended Pak Dairy Board of Director meetings if they were in session and he attended Pak Dairy Board of Directors meetings held at the McKesson offices in San Francisco, California once each year until 1979. As a result of his job responsibilities for McKesson, Carpenter worked closely with Pak Dairy management to develop an overall financial program based on their production capability, sales capabilities and financial requirements and to develop presentations based on their data.

---

**8.** During Plaintiffs' rebuttal case, Reilly testified to the existence of several texts which supported the use of a pre-tax analysis. Plaintiffs asserted that the testimony was to rebut Richman, who allegedly testified directly or indirectly that there were no published sources supporting such a conclusion. Defendant disputed that Richman had ever given such testimony. The Court allowed Reilly's testimony in conditionally, subject to a later determination of whether it was proper.

Plaintiffs subsequently filed a brief, pointing to testimony from Richman that Ibbotson required use of after-tax income. He also testified, later, that "all of the people who do valuations rely on [Ibbotson]." Transcript. 2/15/00 a.m. at 53. The Court finds that this does not amount to an assertion that there are no published sources supporting after-tax analysis. Therefore, Reilly's reference to such sources is stricken and the Court has accordingly not considered it.

Before the Revolution, Carpenter helped develop an expansion plan involving an outlay by Pak Dairy of $7.4 million for three projects. Four million dollars was allocated for a project to commence the production and sale of infant food. Two million dollars was proposed for an increase in Pak Dairy's cold storage facilities, which would enable it to store frozen butter on-site. The increased on-site storage space would enable Pak Dairy to perform more efficiently by eliminating the need to transport butter from the storage space rented downtown. Finally, Carpenter proposed $1.4 million for a third project, a further investment in Sepahan to increase the size of its dairy herd and thus increase the amount of raw milk available to Pak Dairy.

In 1978, Carpenter submitted a proposal to McKesson that it invest $1.24 million as its share of the cost of these New Projects. The proposal made specific income projections for the first three years for the infant food project and for all three projects together. Projections were based on the information obtained from Pak Dairy's financial records and sales and on earning projections from the sales manager and managing director. Subsequently, McKesson approved the $1.24 million expenditure.

The largest of the three projects was the infant food project, which involved a plan to produce, sell and distribute two forms of baby food, an infant milk formula and a cereal formula, the base of which was dried milk powder. At the time of the proposal, there was no current in-country production of either product. Among those importing baby food was Gervais–Danone of France ("Gervais"), which held approximately 28% of the baby food market. The Gervais product had an established distribution system through local pharmacies and was accepted by consumers as a quality brand name. Prior to June of 1978, Pak Dairy negotiated an

agreement with Gervais to produce baby food under the Gervais product name and through its distribution system. The agreement was for an initial period of 10 years with automatic renewal periods of 5 years.

To add this product to Pak Dairy's line and begin production and sales, a number of significant steps were required. By the date of expropriation, following a discussion of the merits of the Project by Pak Dairy's board of directors, Pak Dairy had in fact taken most of the necessary steps. The principal piece of equipment Pak Dairy needed was a "spray dryer," which turned liquid milk into dry milk, the principal ingredient in the infant food formula. By the end of 1978, a spray dryer had been purchased for approximately $1,000,000 from a United States company and installed at the main Pak Dairy facility and was fully operational.[9] In addition, after making a preliminary feasibility study, Pak Dairy constructed a factory for producing the infant food in the northern section of its main plant at a cost of 25 million rials (roughly $300,000 at official exchange rates).

A government license was also required to produce the new product. Prior to the Revolution, Pak Dairy applied for and obtained a license from Iran which gave them the exclusive right to produce baby food under an existing import label. Other imports of baby food would be restricted so long as Pak Dairy met the local demand.

By December of 1978, the only thing Pak Dairy needed to begin actual production and distribution of baby food was packaging equipment, which cost only $35,000 and was commercially available on the market in Europe. However, implementation of the baby food project was halted during the international embargo. In response to the lifting of the embargo in 1981, and at the direction of the Board,

9. Carpenter's 1978 report to McKesson noted that the spray dryer had been purchased previously to enable Pak Dairy to save excess skim provided from the government dairies by converting it to powdered milk, but that since the government now had its own dryer by 1978, Carpenter expected that Pak Dairy's would thereafter be used for baby food.

Pak Dairy management renewed consideration of whether to begin infant food production. In August of 1981, the Managing Director stated in a report to the Board:

since some of the problems have been resolved and there is a possibility for the implementation of the plan for production of children's food and there is a need in the country for such products for the children, and in order to avoid the company's loss due to previous investment in this project, the board of directors is requested to provide its opinion as to whether we should contact Dipal Company and re-visit the possibility of implementing and completing such plan.

Pl.Ex. 12. In response, the Board was still hopeful of implementing the project, and intended to do so after the submission of another "feasibility study" to the Ministry of Industries and Mines and receipt of its opinion. By April of 1982, Pak Dairy had not made a final decision to begin infant food production.

Pak Dairy had also at that time not made the additional investment in Sepahan, nor had it built a new cold storage facility. It had identified a piece of land referred to as the Tanker land, which was situated immediately adjacent to the Pak Dairy main factory and could serve as a site for new storage. Further, in April of 1981, the Board of Directors approved the purchase of the land in principle for this purpose. However, the land's owner rejected certain terms of the offer. Around May 16, 1981, the Managing Director had revised the offer and submitted a new request to the Board of Directors, but the Board had not re-approved the purchase by April of 1982.

The Court concludes that neither the proposed storage facility nor the possibility of an increased supply of milk resulting from the proposed Sepahan investment support any adjustment to income. However, based on the substantial investment that had been made in the baby food project, the relatively small investment that was needed to complete the project, the exclusive license obtained from the government, the distribution agreement and the accompanying access to an established label and system of distribution, the problems that had reportedly been solved, the statements of the Managing Director and the Board pursuing an interest in the project up to the time of valuation, the recognized need and demand for the infant food product and the specific baby food income projections made by knowledgeable employees at Pak Dairy in 1978, the Court finds that an investor would consider the potential income of the infant food project to be a valuable intangible asset. Simply put, a reasonable investor would value the company with the potential described above more highly than the same company without such potential. The Court also finds that the 1978 projections of income are a reasonable starting point for estimating an appropriate adjustment to income to reflect the value of the baby food potential.

However, 1978 specific income projections cannot be considered representative of the value of potential income absent a substantial discount. First, only 91% of the income projections were based on the baby food project. Nine percent of the income adjustment is thus deducted for this reason. The resulting baby food income must be further discounted significantly to account for its uncertainty. The 1978 projections were based on a number of assumptions that proved by 1982 to be highly inaccurate. The projects could not be assumed to be as successful under the new regime and in the context of war as they would be otherwise, particularly considering that in April of 1982, Pak Dairy was suffering limitations on its supply of liquid milk, the necessary raw material for the production of dry milk used in making baby food. Further, in 1982, there was still some doubt as to whether the baby food project could be implemented at all, although this doubt was small for the reasons discussed above.[10] In light of these

10. Because the Court does not consider any

evidence which was not known or knowable

problems and uncertainties, the Court finds it appropriate to discount the 1978 baby food projections by 80 percent. Accordingly, instead of an adjustment of $634,000, the Court finds that the average net cash flow should be adjusted upwards by $115,388. Given that the average net income without the infant food potential is $2,967,000, the net cash flow to be normalized is thus $3,082,388.[11]

### 3. Present Value Discount Rate

The present value discount rate is the overall rate of return on capital that would be demanded by an investor, or the "cost of capital." Because the measure of income Reilly used in his cash flow calculations was Pak Dairy's income before debt service, Reilly's discount rate had to reflect the average rate of return for equity and debt. He therefore appropriately calculated both a rate of return for equity and a rate of return for debt and then calculated the weighted average rate of return to obtain his final present value discount rate.

Both experts calculated the equity rate of return using what is known as the build-up method, which first establishes a "risk-free" rate of return and then adds to that rate to take into account various sources of risk. These additional sources include the long-term equity risk (the added risk of equities over bonds), the small-stock equity risk (the additional risk of investing in small companies over large companies), and the company and country specific risk. (which address risk specific to Pak Dairy and Iran).

on the date of expropriation, it has not taken into account evidence in Defendant's Exhibit 81 that in 1983 the Board made a decision to implement the project.

11. Iran argued both before and during trial that the New Projects are too speculative as a matter of law to be a valid consideration in assessing damages. However, it is established that the proof of the amount of damages need only be based on a "reasonable

#### a. Risk Free Rate

■ The "risk-free" rates used by the two experts were close, but not identical. Reilly used a 10% rate based on the rate of return for Iranian long-term bonds in the Iranian year 1358 (March 1979 to March 1980). Richman used a 10.95% rate based on long term U.S. Treasury bonds.

The "risk-free" rate of return is generally set at the rate of return on long term government bonds in the country where the business is located. Reilly chose the rate for a five-year Iranian bond. Although these long-term bonds were not literally risk-free, they are appropriately used as the basis of the "risk-free" rate because they are the closest thing to a risk free security that was available in Iran in early 1982. Defendant asserted that these bonds were not available in 1982, and that the payment of interest was in any case prohibited by law. However, while the payment of "interest" had become legally forbidden as contrary to Islamic law following the Revolution, banks and creditors continued to charge and receive interest by referring to it as "prizes," "bonuses" and "awards." In particular, payments of principal and interest on the five-year Iranian bond as well as substantial trading of the bonds continued through 1982. Accordingly, the Court accepts the 10% rate chosen by Reilly as the appropriate "risk free" rate of return.

#### b. Long–Term Equity Risk Rate and Small–Stock Equity Risk Rate

■ After determining the "risk-free" rate, the next component of risk to determine is the long-term equity risk rate.

estimate." *Samaritan Inns, Inc.,* 114 F.3d at 1235. "Although a court will not permit a plaintiff to recover damages based on a 'mere speculation or guess,' the fact that an estimate is uncertain or inexact will not defeat recovery, once the fact of injury is shown." *Id.* (citations omitted). Because there is a basis for a reasonable estimate of the value to an investor of the infant food project's potential income, the Court maintains its position that the issue is properly one of fact.

Reilly determined this to be 8.3 percent. This reflects the additional risk of equity securities or common stock over long term bonds. Because there was no Iranian data from which to calculate the long-term equity risk rate, Reilly relied on data found in Ibbotson's 1981 Yearbook (hereinafter "Ibbotson") because the equivalent data was not available for Iranian stocks. Ibbotson documents the rates of return that large New York stock exchange companies paid investors for 1981, the last complete year before the valuation date. That rate was 8.3%, which the Court accepts as the appropriate long-term equity risk rate.

The next component of the present value discount rate is the small stock equity risk premium. This reflects the additional risk involved in investing in a small company such as Pak Dairy. There were no sources of Iranian data on small company risk premiums, so Reilly turned again to the data in Ibbotson. Ibbotson shows that the small stock equity risk premium was 6% in 1981, and the Court accepts that as the appropriate small stock equity risk premium in this case.

c. *Company and Country Specific Risk*

■ The last two components in calculating the present value discount rate are company specific risk and country specific risk.

The company specific risk premium is the additional premium resulting from the fact that Pak Dairy was riskier than the small publically traded companies on which the small-stock risk premium is based. The country-specific risk premium rate reflects the particular risks associated with investing in a company located in Iran. Reilly estimated that it would be 25% riskier to invest in Pak Dairy in Iran than in the companies represented by the small-

stock risk premium. He accordingly calculated his combined company and country specific risk as equal to an additional 25% of the sum of his risk free rate, long term equity risk premium and small company equity risk premium, i.e. 25% of 24.3%, to arrive at a 6% additional premium for company and country specific risk. Of this, he assigned 3% to company risk and 3% to country risk.

Richman also determined that the company risk premium should be 3% but made a judgment that an investor would demand a country-specific risk premium of 12 percent. Thus, he calculated his combined company and country specific risk premium to be 15 percent.

In the appraisal literature, the generally accepted range for the combined company and country specific risk premium is 0% to 10 percent. Given the situation in early 1982, Iran should be placed at the high end of this range. Risks generally taken into account in determining risk include expropriation, hyperinflation (which acts as a form of expropriation by devaluing the currency), and cross-border wars. All three risks were present on the valuation date. Given the Islamic and socialist character of the government, a respect for private property rights was far from assured.[12] Further, inflation was around 20% and the war with Iraq was ongoing, although the risk from war had dramatically diminished and the high inflation rate could also be expected to moderate given the end of the embargo and the rapid increase in oil exports. Accordingly, the Court finds that the country specific risk premium should be 6% and the combined company and country specific risk premium equal to 9 percent. The total cost of equity or equity rate of return is thus 10% + 8 3% + 6% + 9% = 33.3 percent.

12. In assessing the risk of expropriation, the Court does not take into account the historical fact of Iran's interference with McKesson's property, but rather the general risk of expropriation or property interference resulting from the overall character of the government. *See* Restatement § 712, Reporter's

Note 3 ("When a taking arises out of a revolutionary situation that might affect the prospects of the enterprise in the eyes of a hypothetical purchaser, the situation should be taken into account in evaluating the property for purposes of compensation.").

## d. Cost of Debt

Reilly estimated the cost of Pak Dairy's debt based on the range of interest rates on commercial loans reported by Bank Markazi for early 1981. Such rates ranged from 8% to 12%, and Reilly assumed that Pak Dairy would be in the middle. Reilly concluded, and the Court so finds, that the average rate of return to holders of Pak Dairy's debt was therefore 10 percent.

## e. Present Value Discount Rate

The final step in calculating the present value discount rate is to calculate Pak Dairy's mix of equity and debt capital, i.e. the weighted average cost of capital. Approximately 19.7% of Pak Dairy's capital consisted of debt with a 10 percent rate of return. The other 80.3% of Pak Dairy's capital was equity at the 33.3% rate. The weighted cost of capital is thus 28.7 percent. The Court finds that this is the appropriate present value discount rate to determine the value of Pak Dairy.

## 4. Overall DCAP calculation

Given an adjusted average net historical cash flow of $3,082,388 and a growth rate of 15%, the "normalized" income to be capitalized is $3,544,746.20. The capitalization rate is equal to the present value discount rate of 28.7% minus the growth rate of 15%, or 13.7 percent. The value of Pak Dairy calculated under the DCAP method is then equal to the normalized income divided by the capitalization rate, or $25,874,059.85.

This figure includes both the value of the equity in Pak Dairy and the value of its debt. To calculate the total value of the company's equity alone, it is necessary to subtract the value of the debt (approximately $3.637 million), yielding a total equity value of $22,237,059.85.

**13.** A normal procedure to calculate projections of future income would have been to interview company management who were present during the relevant time and obtain

## G. The Discounted Cash Flow Method

In addition to valuing Pak Dairy using the DCAP method, Reilly also valued the company using the DCF method, another income-based approach to valuing a going concern. Under the DCF method, Reilly calculated the value of the company as equal to the present value in April of 1982 of projected net income in the years 1982 through 1986 plus the discounted terminal value of the company in 1987.

To calculate projected net income in 1982–86, Reilly relied on sales projections found in a proposed 1982 budget presented by Khabiri as Managing Director to the Pak Dairy Board of Directors. The figures were prepared by personnel in the sales and production departments. In a Board meeting on April 12, 1982, the Board rejected the budget for three reasons: (1) "the planned budget does not reflect the real situation,"; (2) "the forecasts are not done correctly," and (3) the fiscal year of the company had been changed from one ending in December (as the proposed budget did) to one ending in September. Def. Ex. 72B. Instead, the Board decided not to rely on any prepared budget for that fiscal year.

The proposed 1982 budget projected a 51.2% increase in total revenues in 1982. From this growth projection, Reilly calculated growth projections for succeeding years by scaling down the growth rate by 10% each year until he reached his own estimate of long term growth of 20 percent. He thus calculated a 40% increase in total revenues in 1984, a 30% increase in 1985, and a 20% increase in 1986. Using these growth rates, he calculated net revenues in each year using both the estimated 1982 sales figures and estimated 1982 costs and expenses. He then discounted each year's projected net income using the present value discount rate of 26 percent. Without making any adjustments to reflect the value of the New Projects, he calculated the sum of the present value of net income from April 1, 1982 through 1986 to be $15.839 million.[13] He calculated the

their projections of relevant data. Reilly was unable to do this because Iran refused to grant him a visa permit, although it did grant

terminal value of the company, discounted to its present value, to be $43.969 million. He thus found the fair market value under the DCF method to be approximately $56.2 million.

The Court finds that the DCF method should be rejected in this particular case. Because the DCF method rests entirely on projections of income, it does not offer the inherent accuracy of the actual historical income figures used in the DCAP method. Rather, its reliability depends heavily on the basis of the projections. As stated in Reilly's text, *Valuing a Business*, "the Discounted Economic Income Method is practical only to the extent that the projections used are reasonable to the decision-maker for whom the valuation is being prepared. Without supportable projections, the discounted income method can convey an aura of precision that is not warranted." Tr. 2/17/00 a.m. at 49.

The Court finds that the figures in the 1982 budget are not a sufficiently reliable basis for projecting future income. First, the budget, entered into evidence as Pl.Ex. 20, contains a number of significant errors, although it is not clear whether they are errors in the original Farsi-language version of the proposed budget or errors in the English translation which Reilly relied upon. For example, the very first numbers on the budget indicate that sales of plain milk in ¼ liter bottles rose from approximately 2.5 million units in 1980 to 22 million units in 1981, or roughly 880%, a clearly erroneous value. In fact, the budget also states that the variance between the two years is only 11 percent. Further, the budget prediction for 1982 sales is approximately the same as in 1981, but the budget asserts that this constitutes a 22% rise in sales. Projected figures for the increase in total sales in 1982 are also facially inconsistent. Separate figures for total sales of each separate product line

sum up to an increase of approximately 3.6 billion rials while the single figure provided for total sales of all products shows a rise of only 3.1 billion rials. Given these facial errors in figures in the budget, the Court is unable to find that the figures accurately reflect the predictions of Pak Dairy's various departments.

Further, even ignoring the problem of mathematical errors, the projections cannot be reasonably relied upon. Approximately 80% of the 51.2% increase in 1981 was attributed to a rise in butter sales revenues, which were predicted to increase by 91.7 percent. This projection was based on the assumption that the plant would be producing butter at a rate near its full capacity. However, while supply problems overall were improving for Pak Dairy, as noted above, they were not eliminated by April of 1982, nor was it likely that they would be entirely eliminated during the remainder of the year.[14] Indeed, even the Managing Director's predictions (which he made in a letter to the Board which accompanied the proposed budget) do not on their face support the conclusion of full capacity production for all of 1982. The letter dated February 20, 1982 states only that the company *"will be able* to secure all raw materials" needed for maximum production, Pl.Ex. 18 (emphasis added), not that they had already done so. In any event, it was known in April of 1982 that the company to that date had not approached full capacity production in either butter or milk in the early months of 1982 and that the proposed budget numbers were therefore necessarily erroneous. The prediction of 51% growth for 1982 was thus not one which a reasonable investor would rely upon in April of 1982.

The fact that the budget was ultimately rejected by the Board, standing on its own, would not necessarily condemn the bud-

such a permit to Richman for the same purpose.

**14.** It is noted, however, that contrary to Dadyar's testimony, the sales predicted in the proposed 1982 budget were not beyond the capacity of Pak Dairy. The budget predicted sales of 17,000 tons of butter per year. Pak Dairy's full annual capacity, however, was at least equal to 60 tons per day multiplied by 365 days or 21,900 tons.

get's accuracy. However, it reinforces the Court's conclusion based on the proposed budget itself that the forecasts are not a reliable basis for calculating the market value of Pak Dairy. Accordingly, the Court will rely solely on the value calculated under the DCAP method in determining the fair market value of the company.

## H. The Dividends

Pak Dairy declared a dividend for 1980 income on March 17, 1981 which was approved by the shareholders on April 11, 1981 (the "1981 dividend"). The total dividend amount was 119,790,000 rials. On April 4, 1982, Pak Dairy again declared a dividend for 1981 income equal to 119,790,-000 rials.

The total dividends declared were not the amounts actually paid to Pak Dairy's shareholders, however. Because personal income taxes on the issued dividends were withheld by Pak Dairy, what shareholders received was the after-tax amount. For McKesson, the after-tax amount was equal to 30,710,134 rials for the 1981 dividend and 28,880,545 rials for the 1982 dividend.

Under Pak Dairy's original articles of association, payment of these dividends was due within four months after the approval of the shareholders' general meeting. This four month period applied to the dividends issued on April 11, 1981. However, in October of 1981, the Board of Directors changed this period to eight months from the general shareholder's meeting. Although no specific date of the general shareholder's meeting was mentioned at trial, the Court infers that the right to dividends accrued on April 4, 1982, the same date on which they were declared, and that payment was due eight months later.[15] Therefore, payment of the 1981 dividends was due on August 11, 1981, and payment of the 1982 dividends was due on December 4, 1982.

---

15. This is consistent with the decision of the Claims Tribunal, which, after noting the four month rule in the articles of association, found that Pak Dairy's 1979 and 1980 divi-

## II. Conclusions of Law

### A. Standard of compensation

■ This Court has ruled that under both customary international law and the Treaty of Amity, Iran's interference with McKesson's equity interest in Pak Dairy amounted to a full expropriation of that interest by April of 1982 and that, as part of that expropriation, Iran had wrongfully withheld payment of the 1981 and 1982 dividends in the same manner as it had the 1979 and 1980 dividends. Under both customary international law and the Treaty of Amity, Plaintiffs are entitled to an award of damages equivalent to the full value of the property expropriated. The Treaty of Amity specifically states:

> Property of nationals and companies of either High Contracting Party, including interests in property, shall receive the most constant protection and security within the territories of the other High Contracting Party, in no case less than that required by international law. Such property shall not be taken except for a public purpose, nor shall it be taken without the prompt payment of just compensation. Such compensation shall be in an effectively realizable form and shall represent the full equivalent of the property taken . . . .

Treaty of Amity, Art. IV, para. 2. Customary international law similarly provides that compensation for expropriated property of a foreign national must be "just," Restatement (Third) of the Foreign Relations Law of the United States § 712 (1987) [hereinafter "Restatement"], and that "[f]or compensation to be just . . . it must, in the absence of exceptional circumstances, be in an amount equivalent to the value of the property taken and paid at the time of taking, or within a reasonable time thereafter with interest from the date of taking, and in a form economically usable by the foreign national." *Id.; see Sider-*

---

dends became due and payable four months after the date on which they were declared. *See Foremost Tehran,* 10 Iran–U.S. Cl. Trib. Rep. at 252.

*man de Blake v. Republic of Argentina,* 965 F.2d 699, 711 (9th Cir.1992) (following § 712 of Restatement); *Crist v. Republic of Turkey,* 995 F.Supp. 5, 10–11 (D.D.C. 1998) (same); *see also Starrett Housing Corp. v. Government of the Islamic Republic of Iran,* 314–24–1, ¶ 261 (August 14, 1987), *reprinted in* 16 Iran–U.S. Cl. Trib. Rep. 112, 195 (1988) (*Starrett*) (holding that Treaty of Amity requires that compensation for expropriated property be "just" and "shall represent the full equivalent of the property taken" as of the date of taking).

The "full value" of the property is "usually 'fair market value' where that can be determined." Restatement, § 712 cmt. d. "Such value should take into account 'going concern value,' if any, and other generally recognized principles of valuation." *Id.* The parties do not dispute that Pak Dairy is properly valued as a going concern nor is there a dispute that the income-based methods of valuation, including the DCAP method, are among the generally recognized methods of valuing a going concern. The Court concludes that the DCAP method as used above is appropriate to determine the value of Pak Dairy and that the company's value as of April 1982 was therefore $22,237,059.85.

*B. Appropriateness of Minority or Marketability Discounts*

■ In calculating the value of McKesson's 31% interest in Pak Dairy, Richman took a 35% minority discount and a 10% lack of marketability discount. A minority discount adjusts for lack of control over the business entity on the theory that non-controlling shares of stock are not worth their proportionate share of the firm's value because they lack voting power to control corporate actions. *See Lawson Mardon Wheaton, Inc. v. Smith,* 160 N.J. 383, 734 A.2d 738, 747 (1999). A lack of marketability discount adjusts for a lack of liquidity in an equity interest because the company is not publically traded. *See id.* Although Reilly did not dispute that McKesson's interest did not include control and that in 1982, Pak Dairy was not

publically traded, he nevertheless did not apply either discount, testifying that his valuation already reflected a minority level of value and that a lack of marketability discount was inappropriate where the seller was not willing. Plaintiffs also argued that both discounts are inapplicable as a matter of law when valuing expropriated equity. Although the Court is not persuaded that Reilly's valuation methods resulted in a minority level of value, it nevertheless declines to apply either a minority or lack of marketability discount because the law bars the use of such discounts in the circumstances of this action.

It is appropriate to begin with analogous domestic law, which has addressed the legal propriety of minority and marketability discounts in appraisal actions extensively in recent years. While the case law is not entirely uniform, some principles now command the overwhelming majority of courts. One such principle is that when a court is required in an appraisal action to value a minority interest which is being purchased by the majority shareholder or the corporation itself, then no minority or lack of marketability discount is appropriate. *See Arnaud v. Stockgrowers State Bank of Ashland, Kansas,* 268 Kan. 163, 992 P.2d 216, 218–220 (1999) (collecting cases and commentary, and following majority position); *Lawson Mardon Wheaton, Inc.,* 734 A.2d at 748 ("equitable considerations have led the majority of states and commentators to conclude that marketability and minority discounts should not be applied when determining the fair value of dissenting shareholders' stock in an appraisal action"). Courts rejecting the minority discount have reasoned that the application of the discount would provide the majority with a windfall because they would receive a controlling level of value from the newly obtained shares but only have to pay a non-controlling price for them. *Id. See also Hansen v. 75 Ranch Co.,* 288 Mont. 310, 957 P.2d 32, 41 (1998) ("a sale to a majority shareholder ... simply consolidates or increases the interests of those already in control. Therefore, requiring

the application of a minority discount when selling to an 'insider' would result in a windfall to the transferee."); *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144 (Del. 1989) (same). Courts have followed the same reasoning in denying a lack of marketability discount, since the marketability of shares is generally affected by whether the shares being marketed provide control. *See Arnaud*, 992 P.2d at 219; *Security State Bank, Hartley, Iowa v. Ziegeldorf*, 554 N.W.2d 884, 889 (Iowa 1996) (refusing to apply lack-of-marketability discount because it did not reflect value of controlling interest).[16] Courts further observe that in a forced sale, discounts are inherently unfair to the forced-out shareholder who did not pick the timing of the transaction and thus is not in the position of a willing seller. *See Hansen*, 957 P.2d at 41. Because allowing discounts creates incentives for oppressive behavior, both discounts are particular disfavored where the stock trade is a result of such behavior. *See Morrow v. Martschink*, 922 F.Supp. 1093, 1105 (D.S.C.1995) (" 'it would be inappropriate to impose a discount in a dissenters' rights case or in a case where a minority interest has been improperly squeezed out of the business. Allowing [marketability or minority] discounts in these situations would undercut the purpose of dissenters' rights statutes to give minority shareholders the fair value of their shares, and it could also encourage squeeze outs.' ") (quoting Harry J. Haynsworth, *Valuation of Business Interests*, 33 Mercer L.Rev. 437, 488 (1982)).

Admittedly, these cases involve interpretations of domestic corporate law statutes, not the valuation of an expropriated property under customary international law. However, the position of the foreign shareholder in the face of an expropriating government is analogous to that of the oppressed or forced-out minority and raises the same concerns. Further, the case law of the Iran–U.S. Claims Tribunal, which is the only international precedent on the

issue which has come to the Court's attention, follows the same practice described above. In *Shahin Shaine Ebrahimi v. Government of the Islamic Republic of Iran*, Award No. 560–44/46/47–3 (October 12, 1994) (Westlaw/Int–Iran), the Tribunal addressed both minority and lack of marketability discounts in the context of valuing expropriated shares. It noted that it had previously held explicitly that "a minority discount cannot properly be applied to the value of a minority participation of shareholders in an expropriated case." *Id.* at ¶ 167. It reaffirmed that "while there could be reasons 'to justify the discount of the Claimant's share ... in the context of a valuation in view of an actual sale of shares on the open market,' these reasons were 'not applicable in the context of a deprivation valuation, especially in a case like this one, where the expropriating entity not only expropriated the minority share, but the whole company.' " *Id.* (quoting *Harold Birnbaum v. The Islamic Republic of Iran*, Award No. 549–967–2, ¶ 146 (July 6, 1993)).

The Tribunal similarly rejected the application of a lack of marketability discount, arguing *inter alia* that such a discount was simply inappropriate in the context of an expropriation. It stated that "it must be borne in mind that in an expropriation context such as the present, there is no prospective buyer investing in a closed company who must be offered a discount on the offered shares' face value to reflect the illiquidity of the shares." *Id.* at ¶ 170.

Defendant argues that *Ebrahimi* and *Birnbaum* are distinguishable in that the Tribunal in those cases valued the relevant company using an asset-based approach rather than a discounted future income approach. However, the companies were valued as going concerns, *see Shahin Shaine Ebrahimi* at ¶ 97 ("the Tribunal cannot agree with the Respondent that

---

**16.** The connection between minority status and the marketability of the shares was also noted at trial by Richman.

[the company] had ceased to be a going concern at the valuation date" and valuing company based on assets "plus an amount reflecting its intangible values, including its goodwill, if any"); *Birnbaum* at ¶ 38; *see also Vera–Jo Miller Aryeh v. Islamic Republic of Iran,* Award No. 581–842, ¶ 242 (May 22, 1997) (Westlaw/Int–Iran) (applying *Birnbaum* rule in valuing going concern). It is thus clear that the Tribunal's rule applies to going concern valuations such as the Court has performed here and there is nothing in the Tribunal's decisions to suggest that the rule varies depending on what method of going concern valuation is adopted. Certainly, Iran has not pointed to any decision of the Tribunal or any other international forum which applied either minority or lack of marketability discounts to valuations of expropriated stock. Accordingly, no minority or lack of marketability discount should be taken. Instead, McKesson is entitled to 31% of the full value of Pak Dairy calculated above, or $6,893,488.55.

## C. Value of the Dividends

### 1. Pre–Tax or Post–Tax

■ The parties dispute whether the Court should award Plaintiffs the value of their dividends before taxes or after taxes. It is undisputed that the Iran–U.S. Claims Tribunal, after finding that McKesson had been unlawfully deprived of its share of the 1979 and 1980 dividends, awarded it an after-tax amount. *See Foremost Tehran, Inc,* 10 Iran–U.S. Cl. Trib. Rep. at 252. However, Plaintiffs argue that the dividends should not be reduced to account for tax withholding because customary international law, they assert, holds that a foreign nation's tax laws are not enforceable in this Court. This proposition, even if true, does not affect Plaintiffs' entitlement to compensation. Plaintiffs' entitlement is limited to "the value of the property taken." Restatement, § 712. That part of the dividends which would be withheld for taxes could not have been "taken" from them since they had no legal entitlement to receive such funds and would not have received them even absent the expropria-

tion. Accordingly, the Court concludes that Plaintiffs are entitled to receive only the after-tax value of their dividends, which is 30,710,134 rials for the 1981 dividend and 28,880,545 rials for the 1982 dividend.

### 2. Appropriate Currency Exchange Rate for Lost Dividends

■ The parties agree that the exchange rate to apply in converting Plaintiffs' dividends to dollars is the exchange rate prevailing at the time the right to the benefits accrued, i.e. April 1981 and April 1982 respectively. However, they disagree sharply on how to determine that rate. Plaintiffs argue that the appropriate rate of conversion for the Court to use is the official exchange rate, which was 80.03 rials to the dollar in 1981 and 84.45 rials to the dollar in 1982. Iran, on the other hand, argues that the official rate was both unrealistic and unavailable and that the Court should apply the rate available on the open market in Iran at the relevant times.

The Restatement provides the following rule regarding "judgments on obligations in foreign currency":

> If, in a case arising out of a foreign currency obligation, the court gives judgment in dollars, the conversion from foreign currency to dollars is to be made at such rate as to make the creditor whole and to avoid rewarding a debtor who has delayed in carrying out the obligation.

Restatement, § 823(2). The Reporter's Notes further discuss the method of determining the relevant exchange rate, finding that an official rate may properly be relied upon to convert a foreign currency obligation into dollars unless such a rate does not exist or does not reflect "actual economic conditions." Restatement, § 712, Reporter's Note 5 (citing *Vishipco Line v. Chase Manhattan Bank, N.A.,* 754 F.2d 452 (2d Cir.1985)). In that event, a court "may look to any market rate that reason-

ably reflects economic reality on the relevant date." *Id.*

Courts considering the propriety of using a government's official exchange rate to convert a foreign currency obligation have also suggested that use of an official rate may be appropriate where the rate is available for the purpose of converting obligations of the sort involved in the case. Thus, the court in *U.S. Life Ins. Co. v. Alonso*, 201 So.2d 577 (Dist.Ct.App.Fla. 1967) found that a court should not rely upon an official rate of exchange which was "established for other purposes and does not apply to transactions in controversy." 201 So.2d at 579 (quoting *Hughes Tool Co. v. United Artists Corp.*, 279 A.D. 417, 110 N.Y.S.2d 383 (N.Y.App.Div.1952), *aff'd*, 304 N.Y. 942, 110 N.E.2d 884 (1953)) (internal quotations omitted); *see also Vishipco Line v. Chase Manhattan Bank, N.A.*, 754 F.2d 452, 455 (2d Cir.1985) ("Where local currency restrictions would prevent a party from converting its money into dollars, New York courts have been disinclined to employ 'official' exchange rates, seeking instead to appraise realistically the relative value of the currencies.").

Several facts in the record lead the Court to conclude that the official rate was available for the conversion of Pak Dairy's currency obligations to McKesson. First, the Iran–U.S. Claims Tribunal, acting against the backdrop of international law and the Treaty of Amity, has consistently found it appropriate to convert the value of foreign obligations using the official exchange rate. *See, e.g., Starrett*, 16 Iran–U.S. Cl. Trib. Rep. at 223; *see also International Technical Products Corp. v. Government of the Islamic Republic of Iran*, Award No. 196–302–3 (October 28, 1985), *reprinted at* 9 Iran–U.S. Cl. Trib. Rep. 206, 227 (1987) (referring to official rate as "the market rate prevailing at that time"). Indeed, the Tribunal applied the official rate in converting McKesson's 1979 and 1980 dividends, the dividends declared immediately prior to those at issue here. *See Foremost Tehran, Inc.*, 10 Iran–U.S. Cl. Trib. Rep. at 252. In addition, the Court finds that, before 1979, McKesson would receive its Pak Dairy dividends in dollars converted according to the official rate and that during the early 1980s, Pak Dairy's audited statements continued to state its foreign currency obligations, including liabilities to foreign parties, at the official exchange rate and that it continued to purchase foreign goods using rials converted to dollars at the official rate. Finally, although currency exchange at the official rate was available in 1981 and 1982 only from the Central Bank, there was no convincing evidence at trial in light of the circumstances noted above that the Central Bank would have refused conversion of McKesson's dividends. Accordingly, the Court will apply the 80.03 rial-to-dollar conversion rate for the 1981 dividend and the 84.45 rial-to-dollar conversion rate for the 1982 dividend. Applying these rates, McKesson is owed $383,732.78 for the 1981 dividend and $341,983.96 for the 1982 dividend.

## D. Pre-judgment Interest

Plaintiffs seek prejudgment interest running from the time of the expropriation (or, for the dividends, the time when the dividend was declared). They seek a rate equal to the average annual prime rate in the United States over the period from the taking to the present, with interest compounded annually.

Iran argues that no interest should be applied at all because current Iranian law forbids it. Alternatively, it asserts that the Court should adopt the rate used by the Iran–U.S. Claims Tribunal, and should also follow the Tribunal's practice of awarding simple rather than compound interest. It further argues that the running of interest should be tolled because the action was suspended between 1982 and 1986 and because of equitable considerations.

### 1. Entitlement to Prejudgment Interest

Customary international law provides that, where property has been ex-

propriated, just compensation must be paid "at the time of taking, or within a reasonable time thereafter with interest from the date of taking . . . ." Restatement § 712. This is a natural recognition of the fact that "[m]oney today is not a full substitute for the same sum that should have been paid [18] years ago." *Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*, 954 F.2d 1279, 1331 (7th Cir.1992); *cf. West Virginia v. U.S.*, 479 U.S. 305, 310, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987) ("Prejudgment interest is an element of complete compensation"). Iran's reliance on the Iranian prohibition of interest is inapposite since the entitlement to prejudgment interest is determined by the governing substantive law, *see Terwilliger v. Terwilliger*, 206 F.3d 240, 249 (2d Cir.2000) ("The award of prejudgment interest is a substantive issue"), and Plaintiffs have based their expropriation claim on substantive rights created not by Iran's domestic law but by customary international law and the Treaty of Amity which incorporates it.[17] Thus they are entitled to the compensatory interest payments which such law provides for.

▮ Iran argues that the rule of compensation expressed in Restatement § 712, requiring interest from the date of taking, is inapplicable to the dividends because their withholding is allegedly a "breach of contract" rather than a taking of property. In fact, the right to dividends is an aspect of the property rights which constitute McKesson's 31% equity interest. Thus, their withholding was considered by both the Tribunal and this Court in determining whether McKesson's interest in Pak Dairy had been expropriated. *See Foremost Tehran, Inc*, 10 Iran–U.S. Cl. Trib. R. at 252 (finding that "claim for expropriation" included "a claim for a lesser degree of interference with its rights" such as withholding of dividends); *McKesson Corp.*, Mem. Op. at 24, 1997 WL 361177 at *12; *cf. Mainord v. Sharp*, 569 P.2d 546, 548 (Okla.Ct.Ap.1977) ("shareholder's property rights" include "proportionate share of the dividends, and assets on dissolution"). The Court holds that the rule for injury to property applies and that Plaintiffs are entitled to prejudgment interest on both their expropriated equity and the two dividends.[18]

### 2. Appropriate Rate

International law does not prescribe any particular rate of interest. Accordingly, the applicable rule is the rule of reasonable discretion which governs the award of prejudgment interest in federal courts generally. *See Forman v. Korean Air Lines Co., Ltd.*, 84 F.3d 446, 450 (D.C.Cir.), *cert. denied, Korean Air Lines Co., Ltd. v. Forman*, 519 U.S. 1028, 117 S.Ct. 582, 136 L.Ed.2d 513 (1996). The average prime rate which Plaintiffs argue for has been repeatedly held as appropriate by the D.C.

**17.** Interestingly, Iran has relaxed its prohibition on interest in one respect. In a 1988 opinion from the Guardian Council, the religious body responsible for ensuring that Iranian laws are in accordance with Muslim prescripts, the Council stated that payment of interest *from* foreign nationals *to* Iranian citizens was permissible where such payments were promised by contract. *See* John Y. Gotanda, 90 Am. J. Int'l L. 40, 49 (1996); *Ministry of Defense and Support for Armed Forces of the Islamic Republic of Iran v. Bowen–McClaughlin–York Co./Harsco Corp.*, Case No. 7263/CK, Int'l Ct. of Arb. (Sept. 18, 1996) (attached to Defendant's Revised Proposed Findings as Exh. III) (hereinafter *"Ministry of Defense"*). Whether this exception extends to payment to foreigners is less clear, *id.,* but in its current form it appears more motivated by

economic advantage than Islamic command. Interestingly, *Ministry of Defense* presents something of a mirror of the instant case: that is, it involved an organ of the Iranian government seeking payment of interest from an American corporation based on the interest exception rule. Although the court in *Ministry of Defense* was willing to apply Iranian law (as both parties requested), it refused to apply the interest exception, concluding that because of its discriminatory character it had no place in the international context.

**18.** It is therefore unnecessary to decide whether the rule regarding entitlement to interest on monies owed pursuant to contract under international law would be any different.

Circuit; indeed, the D.C. Circuit has found it "more appropriate" than a fixed investment rate like the 6-month Certificate of Deposit rate which Iran suggests. *Id.* There is no circumstance in this case suggesting that it would be less appropriate here than in *Forman.* Accordingly, the Court will award interest at the average prime rate of 9 percent.[19]

### 3. Method of Calculation—Compound or Simple

The parties dispute whether the Court should calculate prejudgment interest using a compound or simple method. Iran asserts that customary international law provides only for simple interest. Plaintiffs argue that customary international law leaves the method of calculation to the discretion of the forum, and that this Court should therefore apply domestic federal law in resolving the question.

"[I]n ascertaining and administering customary international law, courts should resort to 'the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators.'" *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 715 (9th Cir.1992) (quoting *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900)). The Court finds that international courts have over a period of decades followed the custom of granting only simple interest. Indeed, one commentator found, after canvassing available case law, that "[t]here are few rules within the scope of the subject of international law that are better settled than the one that compound interest is not allowable." M. Whiteman, III *Damages in International Law* 1997 (1943). This international custom has been noted again in commentary more recent, *see* Mann, F.A., *Compound Interest as an Item of Damage,* in F.A. Man, Further Studies in International Law (1990), at 378 (finding that international tribunals

"generally reject" the method of compound interest but arguing that the practice should change) (citation and internal quotation omitted), and was expressly adopted by the Iran–U.S. Claims Tribunal. *See, e.g., R.J. Reynolds Tobacco Co. v. The Government of the Islamic Republic of Iran,* Award No. 145–35–3 (August 6, 1984), *reprinted in* 7 Iran–U.S. Cl. Trib. R. 181, 191 (1986) (relying on excerpt of *Damages in Int'l Law* quoted above). Following this rule, the Tribunal has never awarded compound interest. *See Anaconda–Iran, Inc. v. Government of the Islamic Republic of Iran,* Award No. 65–167–3, at ¶ 138 (December 10, 1986), *reprinted at* 13 Iran–U.S. Cl. Trib. R. 199, 234 (1988). There are a few instances in which other international tribunals have awarded compound interest. *See Renusagar Power Co. v. General Elec. Co.,* Award No. 19 (High Court Bombay, Oct. 12, 1989), *reprinted in* 16 Y.B. Com. Arb. 553, 561–66 (1991); *Kuwait v. American Independent Oil Company (Aminoil),* 21 I.L.M. 976, 1042 (1982). However, in enforcing customary international law, the Court is constrained to follow the custom, not the rare exception, even if there are strong policy reasons to believe that the exception should be the rule. Accordingly, prejudgment interest will be awarded at the prime rate using the simple method of calculation.

### 4. Date From Which Interest Will Run

With regard to the 1981 and 1982 dividends, interest should technically run from the dates of taking, April 11, 1981 and April 4, 1982, respectively. However, because the dividends did not become due under the articles of association until several months later, their value on the date of taking would be some discounted amount of their value on the due date. Instead of calculating this discount, the Court will simply calculate interest from

---

**19.** The Restatement does provide that for interest on money obligations, a court "may, in appropriate cases, order interest to be based on the interest rate applicable at the principal financial center of the state issuing the currency in which the judgment is payable." Restatement § 823 cmt. e. To the extent that this rule is applicable, it is consistent with the choice of the prime rate.

the due date, following the practice of the Tribunal. *See* 10 Iran–U.S. Cl. Trib. Rep. at 252.

■ With regard to McKesson's 31% interest in Pak Dairy, the Court has previously held that the creeping expropriation of McKesson's shareholder rights ripened into a compensable taking by April of 1982:

> By that time, McKesson had not received its dividends for a fourth consecutive year. McKesson had no voice in the management of the company since October 1981, and McKesson had received no shareholder communications from Pak Dairy since it had requested them to be sent in October 1981.

Mem. Op. at 24, 1997 WL 361177 at *12. Given that the Board declared its 1982 dividend on April 4, 1982, *it is appropriate for the Court to treat the precise valuation date from which interest is to run as April 5, 1982.*

■ Iran argues that the date from which interest runs should be tolled during the time the instant action was stayed pending resolution of Plaintiffs' claims before the Iran–U.S. Claims Tribunal. Under the Algiers Accords and pursuant to Executive Order No. 12294, 46 Fed.Reg. 14111, all "claims which may be presented to the ... Tribunal" were "suspended." Such suspension "terminates if the Claims Tribunal determines that it has no jurisdiction over that claim ...." *Dames & Moore v. Regan,* 453 U.S. 654, 665–66, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). Pursuant to this authority, this action, commenced on January 22, 1982, was suspended until April 10, 1986 when the Tribunal issued its ruling.

The Court does not agree that this suspension tolled the accrual of interest. The effect of the suspension was merely to bar Plaintiffs from prosecuting their claim during the relevant period. The suspension did not in any way affect the measure of damages on claims that were subsequently revived. For expropriated property, that measure is the full equivalent of the property at the time of the taking "with inter-

est *from the date of the taking.*" Restatement § 712 (emphasis added). Plaintiffs are therefore entitled to interest during the time when their action was suspended.

■ Iran next argues that because, after receiving the Tribunal's 1986 judgment, Plaintiffs waited until April 1, 1988 to revive their action, they are barred by the equitable doctrine of laches from seeking interest between 1986 and 1988. Iran relies on *West Virginia v. U.S.,* 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987), which stated, in a footnote, that "an equitable consideration such as laches" may "bar an otherwise valid claim for interest ...." *Id.* at 311 n. 3, 107 S.Ct. 702. However, the equitable considerations *West Virginia* referred to are applicable only where the law leaves it "for the federal courts to determine, according to their own criteria, the appropriate measure of damage ...." *Id.* at 309, 107 S.Ct. 702. Such considerations do not apply where the measure of damage is itself defined by the substantive law. Thus, *West Virginia* distinguished cases where prejudgment interest was commanded "by an applicable federal statute." *Id.* Here, customary international law expressly directs that interest be provided as "the appropriate measure of damage." Accordingly, it is not for the Court to determine by its own criteria whether to grant it.

Further, even if this Court had discretion to consider laches, it would be found inapplicable. Laches is an affirmative defense that requires findings that the plaintiff delayed unreasonably in raising a claim and that the defendant was prejudiced thereby. *See Burka v. Aetna Life Ins. Co.,* 56 F.3d 1509, 1514 (D.C.Cir.1995). However, Plaintiffs did not delay at all in raising their claim of expropriation in 1982. Although when reviving their claim, Plaintiffs did alter the theory somewhat by alleging a later date and additional instances of interference with their rights leading up to that date, the essential claim was identical: a creeping interference with Plaintiffs' shareholder rights which ulti-

mately ripened into an unlawful expropriation of the equity interest. Further, Plaintiffs' delay in reviving their claim (if that were relevant) was not unreasonable, and in any case, Iran has demonstrated no prejudice by the delay. The additional interest owed is simply the application of the same measure of "just compensation" which Iran owed all along.

Iran also argues that Plaintiffs are barred from receiving interest for having failed to mitigate damages. This argument rests on Defendant's assertion that Plaintiffs could have obtained their dividends at any time by coming to Pak Dairy in Tehran and making an on-site request for the dividends. Defendant asserts that Plaintiffs had a duty to do so. The Court has previously found as a matter of law that Plaintiffs had no such duty and that even if McKesson had made an on-site request for dividends, it would have been futile. *See* Mem. Op. at 21–22, 1997 WL 361177 at *10–11.

More generally, the Court simply finds untenable the notion that Iran has any equitable claim against the Plaintiffs in this matter. What both equity and international law demand is that Plaintiffs receive the equivalent value of their expropriated property including its time value since the date of taking. For all of these reasons, the Court finds that no tolling of interest is appropriate.

### III. Conclusion

Calculating simple interest at 9% from August 12, 1981 to May 26, 2000, the Court finds that Plaintiffs are owed $649,370.76 in interest on the 1981 dividend. Calculating from December 5, 1982 to May 26, 2000, the Court finds that Plaintiffs are owed $538,246.26 in interest on the 1982 dividend. Finally, calculating from April 5, 1982 to May 26, 2000, the Court finds that Plaintiffs are owed $11,264,338.03 in interest on the expropriated equity.

In sum, the Court finds that Plaintiffs are entitled to the following: $383,732.78 for the 1981 dividend plus $649,370.48 in interest; $341,983.96 for the 1982 dividend plus $538,245.34 in interest; and

$6,893,488.55 for the expropriated equity plus $11,264,338.03 in interest, for a total compensatory award of $20,071,159.14.

An appropriate judgment will accompany this decision.

### *JUDGMENT*

The Court having found that defendant Islamic Republic of Iran is liable and that the remaining defendants have defaulted, and upon consideration of the findings of fact and conclusions of law set forth in the Court's Memorandum Opinion of this date, it is hereby

**ORDERED, ADJUDGED AND DE-CREED** that judgment is entered in favor of the Plaintiffs McKesson Corporation, Foremost Tehran, Inc., Foremost Shir, Inc., Foremost Iran Corporation, and Overseas Private Investment Corporation, jointly and severally, and against defendants the Islamic Republic of Iran, Financial Organization For The Expansion of Ownership of Productive Units, National Investment Company of Iran, Industries And Mines Bank, Foundation For The Oppressed, and Sherkat Sahami Labaniat Pasteurize Pak, jointly and severally, in the amount of $20,071,159.14, plus post-judgment interest as provided by law until this judgment is paid in full.

### *MEMORANDUM–OPINION*

Presently pending is Plaintiffs' motion for reconsideration pursuant to Fed. R.Civ.P. 59(e). Plaintiffs seek reversal of this Court's decision denying them pre-judgment compound interest and awarding only simple interest. For the reasons discussed below, Plaintiffs' motion is denied.

### *I. Discussion*

■ Rule 59(e) motions "need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Anyanwutaku v. Moore,* 151 F.3d 1053, 1057 (D.C.Cir.

**44**

1998) (citation and internal quotations omitted), *see also Firestone v. Firestone.* 76 F.3d 1205, 1208 (D.C.Cir.1996). Conversely, a "Rule 59(e) motion is not a second opportunity to present argument upon which the Court has already ruled, nor is it a means to bring before the Court theories or arguments that could have been advanced earlier" *W.C. & A.N. Miller Companies v. U.S.,* 173 F.R.D. 1, 3 (D.D.C. 1997), *aff'd, Hicks v. U.S.,* 1999 WL 414253 (D.C.Cir. May 17, 1999).

In the Court's Memorandum–Opinion filed May 26, 2000, the Court determined the amount of damages for the expropriation of Plaintiffs' equity interest in the Iranian dairy company, the Sherkat Sahami Labaniat Pasteurize Pak ("Pak Dairy") and for their share of Pak Dairy's 1981 and 1982 dividends. *See Memorandum–Opinion,* Civ. A. No. 82–220 (May 26, 2000). After determining the value of the expropriated interests, the Court concluded that under customary international law, Plaintiffs were entitled to prejudgment interest calculated from the date of taking. *Id.* at 46–48. However, the Court denied Plaintiffs' request for compound interest. *Id.* at 50. After reviewing the state of customary international law and finding that the clear majority of international courts have historically awarded only simple interest, the Court concluded that in applying customary international law, it must follow this practice *Id.* at 49–50.

■ Plaintiffs now move for reconsideration based on a recent arbitration decision by the International Centre for Settlement of Investment Disputes ("ICSID"), *Compania del Desarollo de Santa Elena. S.A. v. Republic of Costa Rica* (hereinafter "*Santa Elena*"), ICSID Case No ARB/91/1 (Washington, D.C. February 17, 2000).[1] Plaintiffs argue that *Santa Elena* presents new authority on the availability and propriety of compound interest under international law and that it demonstrates

that this Court's view of international law was erroneous.

In *Santa Elena,* the panel arbitrated a dispute over the correct amount of compensation which Costa Rica owed for property which it had expropriated. After determining the value of the property on the date of the taking, the panel also awarded interest from that date. It further concluded that interest should be calculated on a compound basis. The panel reviewed various sources of international law and found that "[n]o uniform rule of law has emerged from the practice in international arbitration as regards the determination of whether compound or simple interest is appropriate in any given case." *Id.,* Pl.Ex. 2 at ¶ 103. The panel concluded that the decision was left to the judgment of the ruling body, "taking into account all of the circumstances of the case at hand and especially considerations of fairness . . . ." *Id.* The panel then decided that in an expropriation case "where an owner of property has at some earlier time lost the value of his asset but has not received the monetary equivalent that then became due him," compound interest was necessary to ensure full compensation. *Id.* at ¶ 104. Plaintiffs now assert that this ruling demonstrates that they are entitled to compound interest as compensation for the expropriation of their interests in Pak Dairy.

The Court finds that Plaintiffs' motion for reconsideration fails to satisfy the applicable standard for granting such motions. First, Plaintiffs have demonstrated no change in controlling authority. The recent decision of one arbitration panel of the ICSID does not, as Plaintiffs argue, constitute an "authoritative" determination of international law which this Court is bound to follow. Customary international law is a product of "the customs and usages of civilized nations, and, *as evidence of*

---

1. The Court was informed by Plaintiffs that the ICSID intended to publish the decision in its Spring 2000 reports. As of the date of this decision, however, the opinion in *Santa Elena* is not listed on the ICSID website as having been published. *See* http://www.worldbank.org/icsid/cases/conclude.html (listing *Santa Elena* as concluded but not published).

*these,* to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat." *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900) (emphasis added). The *Santa Elena* decision thus presents relevant evidence of international law but must still be considered in light of the other evidence available. It thus cannot be "authoritative" in the sense that a controlling decision of law would be. For similar reasons, *Santa Elena* does not demonstrate that this Court committed clear error in following the practice of the vast majority of international cases and the explicit ruling of the Iran–U.S. Claims Tribunal, for these sources are also valid evidence of international law.

However, even considering the matter *de novo,* the Court is not persuaded that *Santa Elena*'s view of international law is the correct one. To demonstrate that customary international law provides for compound interest, *Santa Elena* cites only one such award in the last sixty years, the *Aminoil* case. *See Kuwait v. American Independent Oil Co. (Aminoil),* 21 I.L.M. 976 (1982) Whether *Aminoil* actually awarded compound interest under international law is questionable, because the tribunal in that case had explicit authority to choose from various sources which law to apply on any particular substantive issue and it did not specify what law it relied on in awarding compound interest. *Id.* at 1000, 1042.

Even ignoring this ambiguity, however, *Aminoil,* does not support the existence of a customary rule. In determining customary international law, this Court is restricted to a "settled rule of international law" which has commanded the "general assent of civilized nations." *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900). "The requirement that a rule command the 'general assent of civilized nations' to become binding upon them all is a stringent one." *Hamid v. Price Waterhouse,* 51 F.3d 1411, 1418 (9th Cir.1995) (citation and internal quotations

omitted). "Were this not so, the courts of one nation might feel free to impose idiosyncratic legal rules upon others, in the name of applying international law." *Id.*

There is no dispute among the available cases or commentators that compound interest has rarely been granted, and when requested has almost always been expressly rejected. *See* M. Whiteman, III *Damages in International Law* 1997 (1943) ("Although in rare cases compound interest, or its equivalent, has been granted, tribunals have been almost unanimous in disapproval of its allowance. This is particularly true when the attention of the tribunal has been especially brought to the point."). In light of this almost uniform international jurisprudence rejecting compound interest, one or two cases to the contrary cannot establish the general assent of nations to such awards.

The panel in *Santa Elena* found additional support for an award of compound interest in the written opinions of two commentators. First, it noted the opinion of the late Professor F.A. Mann that under international law, "compound interest may be and, in the absence of special circumstances, should be awarded to the claimant as damages by international tribunals." *See* Mann, F.A., *Compound Interest as an Item of Damage,* in F.A. Mann, Further Studies in International Law, 385 (1990). However, Dr. Mann apparently viewed international law under a different standard than the "settled rule" standard applicable here, for he also conceded that Whiteman's contrary view that "compound interest is not allowable" was supported by numerous decisions. *Id.* at 377–78. While it might be appropriate to draw a customary rule from limited authority where such authority stands alone, it is far more questionable to do so where international tribunals and commentators have repeatedly expressed a contrary conception of the law. Given the majority practice rejecting an award of compound interest, it is difficult to conclude that a rule authorizing compound interest has become settled.

Indeed, Dr. Mann found that even the domestic laws of various "civilized countries" did not provide "unequivocal" evidence of the acceptance of compound interest. In countries such as England, France, Germany, Switzerland and the United States, he found that a law typically "does not authorize (but does not prohibit) the payment of compound interest" *Id.* at 381. He was therefore left to conclude not that compound interest is already accepted but that it *"should* be accepted wherever damages are allowed and *should* be treated as a general principle of law." *Id.* at 383. He urged courts to "inaugurate 'a new conception of justice in accord with the highest knowledge and truest insight perceptible to the human mind.'" *Id.* (citation omitted).

Even if Dr. Mann's insights reflect a better or more accurate view of compensation, this Court cannot follow them in absence of actual authority under customary international law to do so. As the Supreme Court has indicated, works of learned jurists and commentators "are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is." *The Paquete Habana,* 175 U.S. at 700, 20 S.Ct. 290. Dr. Mann's opinion that a new rule is justified is thus not a persuasive basis for rejecting the established majority rule as the current state of international law.

The panel in *Santa Elena* cited to another commentator, Professor Gaetano Arangio-Ruiz who as Special Rapporteur of the United Nations International Law Commission on State Responsibility stated: "The Special Rapporteur is therefore inclined to conclude that compound interest should be awarded whenever it is proved that it is indispensable in order to ensure full compensation for the damage suffered by the injured State." II *Yearbook of the Int'l Law Commission,* Part I, at 30 (1989). However, this opinion also appears to suffer the flaw noted above in connection with Dr. Mann. While Dr. Arangio-Ruiz as commentator may have indicated

that compound interest should be awarded, it is undisputed that as an actual jurist of the Iran–U.S. Claims Tribunal, he has repeatedly signed on without any dissent to opinions awarding only simple interest, indicating that his view of what the law should be and what it actually is are not coextensive. *See, e.g., Shahin Shaine Ebrahimi v. Government of the Islamic Republic of Iran,* Award No. 560–44/46/47–3, ¶ 179 (October 12, 1994) (Westlaw/Int-Iran) (finding liability for expropriation and awarding simple interest from the date of taking).

In sum, this Court finds that *Santa Elena* and the sources it relies upon are not persuasive evidence of customary international law and that the law as evidenced by the majority of relevant cases and as expressed most recently by the Tribunal is the applicable rule.

Plaintiffs argue that the decisions of the Tribunal which reject compound interest are distinguishable from *Santa Elena* and the instant case. Plaintiffs assert that the Tribunal based its denial of compound interest not on customary law but on the special features of the Tribunal and the Algiers Accords. Plaintiffs cite *McCollough & Co. v. Ministry of Post. Telegraph and Telephone,* Award No. 225–89–3 (April 22, 1986), *reprinted at* 11 Iran–U.S. Cl. Trib. R. 3 (1988). However, Plaintiffs overlook the fact that the Tribunal has explicitly rested its practice of denying compound interest on international law. *See, e.g., R.J. Reynolds Tobacco Co. v. The Government of the Islamic Republic of Iran,* Award No. 145–35–3 (August 6, 1984), *reprinted at* 7 Iran–U.S. Cl. Trib. R. 181, 191 (1986). Conversely, although *McCollough* did rely on the Algiers Accords and the specific features of the Tribunal in connection with determining an award of interest, it did so in order to determine the rate of interest and the date from which interest was to run, not the method of accumulation. *McCollough,* ¶ 102, 11 Iran–U.S. Cl. Trib. R. at 30 Indeed, applying *McCollough's* reasoning to the issue of compound interest leads to a

contradiction, for one of the "specific features" of the Tribunal which concerned it was the likelihood that claims would be long delayed before resolution. *Id.* However, Plaintiffs themselves argue that cases of long delay present a *greater*, not a lesser justification for compound interest. Thus, had the Tribunal been motivated by concerns over delay, it would have awarded compound interest. The Court concludes that the Tribunal's practice of awarding only simple interest is based not on concern over delay but other on the Tribunal's understanding of customary international law.[2]

■ Plaintiffs also argue, as did the panel in *Santa Elena*, that the customary practice of awarding only simple interest applies primarily in cases of personal injury or breach of contract and that "[t]he same considerations do not apply to cases relating to the valuation of property or property rights." *Santa Elena* at ¶ 97. However, *Santa Elena* failed to provide any evidence that international law reflects this distinction. The only support provided by the panel was a quotation allegedly drawn from the Tribunal decision in *Flexi–Van Leasing, Inc. v. Iran* which the panel erroneously cited at 9 Iran–U.S. Cl. Trib. R. 206. However, neither *Flexi–Van*, Decision No. DEC 54–36–1 (Dec. 18, 1986), *reprinted at* 13 Iran–U.S. Cl. Trib. R. 324(1988), nor *Int'l Technical Products Corp. v. Iran*, the case actually reported at 9 Iran–U.S. Cl. Trib. R. 206 (1987), address the issue of compound interest at all. Further, the quotation *Santa Elena* relied upon, most likely drawn from *McCollough*,, merely states correctly that "occasionally compound interest has been awarded." *McCollough & Co.*, at ¶ 96, 11 Iran–U.S. Cl. Trib. R. at 28. It offers no support for

*Santa Elena*'s distinction between property and contract cases.

That distinction is also not supported by the cases which award compound interest or the far more numerous cases which do not. The case most often cited as awarding compound interest is, as noted above, *Aminoil*. However, the arbitration panel in *Aminoil* awarded damages for both contract and property claims and then provided for compound interest on damages without making any of the distinctions suggested by *Santa Elena*.

Conversely, numerous expropriation cases have been reported which award only simple interest or affirmatively reject an award of compound interest. For example, in *Norwegian Shipowner's Claims (Norway v. U.S.)*, 1 R. Int'l Arb. Awards 307 (1922), the United States and Norway submitted to arbitration the claims of Norwegian citizens that the United States had expropriated their vessels. The tribunal awarded the shipowners damages including interest. In awarding interest, the tribunal provided a number of reasons which it found sufficient to justify an award of simple interest:

> the Tribunal has taken into consideration the facts that the United States have had the use and profits of the claimant's property since the requisition of five years ago, and especially that the sums awarded as compensation to the claimants by the American Requisition Claim Committee have not been paid, finally that the United States have had the benefit of the progress payments made by Norwegians with reference to these ships.

*Id.* at 341. However, the tribunal in *Norwegian Shipowners* expressly held that

---

**2.** Plaintiffs have noted that this Court allowed itself to be guided by the practice of the federal courts in determining the appropriate rate of interest but not in determining the method of calculation. This disparity in treatment is directly reflected in the reasoning of *McCollough* When addressing whether to grant compound interest, the Tribunal found that " '[t]here are few rules within the scope of the subject of international law that are

better settled than the one that compound interest is not allowable.' " *R.J. Reynolds Tobacco Co.*, 7 Iran–U.S. Cl. Trib. R. 181, 191 (quoting M. Whiteman, III *Damages in International Law* 1997 (1943)). In contrast, when the Tribunal in *McCollough* considered how to determine an appropriate rate of interest, it expressly relied on the "discretion recognised [sic] by international law" *McCollough*, ¶ 103, 11 Iran–U.S. Cl. Trib. R. at 30.

these considerations were insufficient to justify an award of *compound* interest. It stated:

> The claimants have asked for compound interest with half-yearly adjustments, but compound interest has not been granted in previous arbitration cases, and the Tribunal is of the opinion that the claimants *have not advanced sufficient reasons* why an award of compound interest, in this case, should be made.

*Id.; see also V. Hackworth, Digest of Int'l Law,* 736 (1943) (reprinting quotations).[3]

Further, the jurisprudence of the Iran–U.S. Claims Tribunal is replete with examples of expropriation awards providing only simple interest. Most strikingly, in *Starrett Housing Corp. v. Islamic Republic of Iran,* Award No. 314–24–1, ¶ 370–71 (August 14, 1987), 16 Iran–U.S. Cl. Trib. R. 112, 234–35 (1988), the majority rejected an award of compound interest despite strong arguments for such an award coming from both the claimants and a concurring opinion by Judge Holtzmann. *See id.,* 16 Iran–U.S. Cl. Trib. R. at 251–54 (Holtzmann, concurring in part and dissenting in part). *Starrett* thus confirms that the Tribunal rejected compound interest in property as well as contract cases.

The distinction between property and contract claims is also absent from the jurisprudence of the Foreign Claims Settlement Commission ("Commission"), a quasi-judicial body of the United States government authorized to adjudicate certain categories of international claims. *See* 1998 FCSC Ann. Rep. at 4, available at http://www.usdoj.gov/fcsc/annrep98.html; *see also* 1993 FCSC Ann. Rep. at 6. Historically, the Commission has awarded only simple interest in expropriation claims despite the passage of long periods of time between the taking and the award. *See Shanghai Power Co. v. U.S.,* 4 Cl.Ct. 237, 239 (Cl.Ct.1983) (noting that Commission awarded simple interest on claim that People's Republic of China had expropriated power company), *aff'd,* 765 F.2d 159 (Fed.Cir.1985); *Maria A. Stevens, reprinted at* 1998 FCSC Ann. Rep. at Exh. II (finding Albania liable for expropriation and awarding simple interest "[i]n accordance with applicable principles of international law and its decisions in previous claims programs"). Of particular note are the Commission's adjudications of claims against Iran. Specifically, in 1990, the Commission was given authority to adjudicate small claims lodged against Iran following the Revolution.[4] The Commission's

---

**3.** The reference in *Norwegian Shipowners* to "special circumstances" that might justify compound interest has been repeatedly lached onto by those seeking to demonstrate that compound interest is not entirely unavailable. *See* II *Yearbook of the Int'l Law Commission,* Part I, at 30 (1989). The difficulty with relying upon this language is not merely that the "special circumstances" are never identified, but that the facts of *Norwegian Shipowners* establish that the expropriation of a money-earning property is not one of those special circumstances. Thus, it is notable that in *British claims in the Spanish Zone of Morocco,* (reported at II *Yearbook of the Int'l Law Commission,* Part I, at 30 (1989)), the arbitrator also made reference to "particularly strong and quite special arguments need[ed] to be advanced to accept" compound interest, but concluded that "[s]uch arguments do not appear to exist ...." These references to special circumstances thus offer little basis for the entitlement to compound

interest which *Santa Elena* found to exist in virtually any expropriation case.

**4.** These small claims were initially under the jurisdiction of the Iran–U.S. Claims Tribunal. However, in 1985, Congress passed a law giving the Commission stand-by jurisdiction over these claims pending a global settlement between Iran and the United States. On May 13, 1990, the United States and Iran entered into an agreement which provided for the espousal of all small claims by the United States, extinguishing Iran's liability, in return for which Iran would pay a lump sum of $105 million. Following the agreement, the Commission's jurisdiction to adjudicate these claims became effective. The $105 million was then used to establish a fund for the satisfaction of any awards by the Commission. *See Abrahim–Youri v. U.S.,* 139 F.3d 1462, 1464 (Fed.Cir.1997) (summarizing history of the Commission's adjudication of Iranian small claims).

published decisions (available in its Annual Reports to the Congress) indicate that in ruling on these small claims, it uniformly awarded only simple interest, even in claims of expropriation. *See, e.g., Darioush, Diana & Daniel Elghanayan,* Dec. No. 1083, *reprinted at* 1993 FCSC Ann. Rep. 11, 18 (awarding damages for expropriation and holding that "[i]n accordance with Tribunal precedent, recognized principles of international law, and its decisions in previous claims programs, the Commission further concludes that the claimants are entitled to interest as part of their awards, amounting to 10 percent *simple interest* per annum ....") (emphasis added); *Nouriel Aryeh, Samuel Aryeh, Ouriel Aryeh & Emanuel Aryeh,* Dec. No. IR–2365, *reprinted at* 1994 FCSC Ann. Rep. 19, 38 (same); *Angel Murad,* Dec. No. IR–2226, *reprinted at* 1994 FCSC Ann. Rep. 59, 65 (same). Based on all of these authorities, the Court must reject *Santa Elena*'s asserted distinction between contract and property cases, and conclude that in all cases, customary international law does not provide for compound interest.

Finally, even if customary international law authorizes an award of compound interest at the discretion of the awarding body, this Court finds that the almost uniform practice of awarding only simple interest is a relevant and compelling consideration in the exercise of that discretion. The cases before the Tribunal and this country's own Commission are particularly relevant since both addressed claims of U.S. citizens against Iran for expropriations which occurred more than 10 years previously, claims directly comparable to Plaintiffs' own. Both bodies, acting under international law, awarded only simple interest. This Court finds that these cases and the other authorities supporting their practice offer persuasive guidance and accordingly, even with discretion, this Court concludes that simple interest is the appropriate award.

Accordingly, Plaintiffs' motion is denied. An appropriate order will accompany this decision.